**Margarethe CAMMERMEYER, Plaintiff,**

**v.**

**Les ASPIN, Secretary of Defense,[1] et al., Defendants.**

**No. C92–942Z.**

United States District Court, W.D. Washington, Northern Division.

June 1, 1994.

1. Although William J. Perry is now the Secretary of Defense, he has not yet been formally substituted as a named defendant.

Jeffrey I. Tilden, Michael H. Himes, Perkins Coie, Seattle WA, Mary Newcombe, Hedges & Caldwell, Los Angeles, CA, for plaintiff.

David M. Glass, U.S. Dept. of Justice, Civil Div., Federal Programs Branch, Washington, DC, for defendants.

## ORDER

ZILLY, District Judge.

Margarethe Cammermeyer brings this declaratory judgment action against the Government claiming that her discharge from military service under Army Regulation 135–175, based solely on her admission that she is a lesbian, violated her rights to equal protection of the laws guaranteed under the Fifth Amendment to the United States Constitution. She also claims her discharge violated her right to privacy under the First, Fourth, Fifth and Ninth Amendments to the Constitution, her substantive due process rights under the Fifth Amendment and her right to freedom of speech under the First Amendment. Cammermeyer further claims that Army Regulation 135–175 is an invalid exercise of executive power violative of the constitutional separation of powers, and that the regulation violates principles of federalism.

The parties have now filed cross-motions for summary judgment. Plaintiff moves for summary judgment on her equal protection claim (docket no. 50). Defendants move for judgment on the pleadings or, in the alternative, summary judgment on all of plaintiff's claims (docket no. 59). The Court heard oral argument on these cross-motions on April 20, 1994, and took the matter under advisement. The Court has reviewed all of the materials submitted by the parties and now GRANTS plaintiff's motion for summary judgment as to her equal protection and substantive due process claims under the Fifth Amendment, and GRANTS defendants' motion for summary judgment as to the remainder of plaintiff's claims.

2. Cammermeyer was married from 1966 until 1980 and she and her husband had four sons. She was forced to resign upon her first pregnancy in 1968 following more than seven years of active duty as a result of then-applicable Army regulations. Due to a change in Army regula-

## I. BACKGROUND

Margarethe Cammermeyer is a former Colonel of the Washington State National Guard. She entered the Army Student Nurse Corps in 1961, and with the exception of a four year period when she was ineligible for service,[2] Cammermeyer served in the Army until 1986. In that year, Cammermeyer transferred to the Washington State National Guard where she continued to serve until she was discharged on June 11, 1992.

Cammermeyer's expertise as an Army Nurse is remarkable. She has earned bachelor's, master's and doctorate degrees in Nursing. She was a member of the Clinical Faculty of the University of San Francisco School of Nursing where she co-authored four research articles published in the *Journal of Military Medicine.* Cammermeyer Decl. at ¶¶ 3, 8, 12, 19. In addition, she has received numerous awards and distinctions, including the Bronze Star for distinguished service in Vietnam.[3] *Id.* at ¶ 6. She volunteered and served in Vietnam for fifteen months with distinction. *Id.* at ¶¶ 5–6. Cammermeyer has served in numerous other capacities in the Army and Washington State National Guard, including medical-surgical supervisor and Assistant Chief Nurse of the 50th General Hospital in Fort Lawton, Washington, Chief Nurse of the 352nd Evacuation Hospital in Oakland, California, and State Chief Nurse and consultant to the State Chief Surgeon at Camp Murray, Washington. *Id.* at ¶¶ 8, 11, 15.

In April, 1989, Cammermeyer applied for admission to the Army War College to receive training she considered essential to her goal of becoming Chief Nurse of the National Guard Bureau ("NGB"). *Id.* at ¶ 16. During a top secret security check required for admission to the Army War College, Cammermeyer was asked about her sexual orienta-

tions, she was able to reenlist in the Army Reserve in 1972.

3. The recommendation for her Bronze Star provided, in part, that "[h]er professional and personal conduct merit the highest praise and reflect great credit upon herself and the United

tion and answered that she is a lesbian.[4] Notwithstanding this admission, Cammermeyer was told by the Washington State National Guard that she could continue to serve as Chief Nurse, and that the Guard would not pursue her discharge "unless forced to do so" by the Department of the Army. *Id.* at ¶ 18. Alternatively, she was told she could resign. Cammermeyer chose to continue to serve. Six months later, pursuant to service-wide federal regulations barring homosexuals from the military, the United States Army commenced proceedings to withdraw Cammermeyer's "federal recognition" and thus render her ineligible to serve in the Washington State National Guard or any other branch of the military.[5]

Cammermeyer continued to serve in her position as Chief Nurse for more than three years after she admitted that she is a lesbian. During this period, a military retention board was convened to review whether Cammermeyer's federal recognition should be withdrawn because of her lesbian status. On July 14, 1991, after a two-day hearing, the Board recommended withdrawal of Cammermeyer's federal recognition. In presiding over the Board, former Chief Nurse, NGB, Colonel Patsy Thompson openly regretted her "sad duty" of reading the Board's adverse recommendation to "one of the great Americans." Tr. of Hearing before Federal Recognition Board, Vol. 2, at 131–33. Colonel Thompson stated that Cammermeyer "has consistently provided superb leadership and has many outstanding accomplishments to her credit." *Id.* at 132.

On June 11, 1992, Cammermeyer was discharged based upon the Board's recommendation and received an honorable discharge.[6] Cammermeyer's final evaluation, dated July 31, 1992, describing her contributions to the Army and noting her discharge, concluded that "[t]his officer has the potential to serve as Chief Nurse, NGB; and to represent her profession in major research projects in military medicine anywhere in the world." Cammermeyer Decl., Exhibit D, Officer Evaluation Report (OER) dated July 31, 1992. Prior to her discharge, Washington Governor Booth Gardner, Commander-in-Chief of the Washington State National Guard, wrote a letter to then Secretary of Defense Richard Cheney requesting that Cammermeyer be retained. Cammermeyer Decl. Exhibit H. That letter states, in part, that "if Colonel Cammermeyer's discharge becomes final, this would be both a significant loss to the State of Washington and a senseless end to the career of a distinguished, long-time member of the armed services." *Id.*

## II. *DISCUSSION*

### A. Summary Judgment Standard

Summary judgment is appropriate if the record shows " 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Williams v. I.B. Fischer Nev.*, 999 F.2d 445, 447 (9th Cir.1993) (*quoting* Fed. R.Civ.P. 56(c)). In determining whether there are any genuine issues of material fact for trial, the court must view all of the evidence in the light most favorable to the nonmoving party. *Abuan v. General Electric Co.*, 3 F.3d 329, 332 (9th Cir.1993), *cert. denied*, ─── U.S. ───, 114 S.Ct. 1064, 127

States Army Medical Service...." Complaint (docket no. 1) at ¶ 4.6.

4. Her formal statement, written by the DIS Investigator based upon their conversation but edited and initialed by Col. Cammermeyer, states: "I am a Lesbian. Lesbianism is an orientation I have, emotional in nature, towards women. It does not imply sexual activity...." Cammermeyer Decl., Ex. G.

5. The Army National Guard is comprised of two separate but overlapping organizations, the National Guards of the various states and the National Guard of the United States ("NGUS"). Under the dual system, a servicemember may not become an officer in the NGUS until he or she has been promoted to the same grade in the state National Guard and been "federally recognized." 10 U.S.C. § 591(a). A board of officers may be convened at any time to investigate an officer's "capacity and general fitness" to retain his or her Federal recognition. 32 U.S.C. § 323(b). On the board's recommendation, an officer's Federal recognition may be withdrawn, requiring mandatory discharge from the State National Guard. 32 U.S.C. §§ 323(b), 324(a)(2).

6. Cammermeyer is believed to be the highest ranking officer in any service of the U.S. Armed Forces to have been discharged because of homosexual status.

L.Ed.2d 383 (1994). This is true even when the court is presented with cross-motions for summary judgment. *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.1990). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abuan*, 3 F.3d at 331 (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Once a summary judgment motion is made and properly supported, the adverse party may not rest on the mere allegations of his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e). If there is any need to *weigh* the evidence at issue, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## B. Equal Protection Challenge

■ Both parties move for summary judgment on plaintiff's claim that her discharge from the Washington State National Guard violated her equal protection rights under the Fifth Amendment to the United States Constitution.

### 1. *Equal Protection Standard*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). While the Fifth Amendment does not contain an equal protection clause, the due process clause of the Fifth Amendment has an equal protection component that applies to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

■ There are three standards of review applicable to equal protection challenges to governmental regulations: strict scrutiny, heightened scrutiny, and rational basis review. *High Tech Gays*, 895 F.2d at 571 (citing *Cleburne*, 473 U.S. at 440–41, 105 S.Ct. at 3254–55, 87 L.Ed.2d at 320–21). Legislative classifications based on race, alienage, or national origin require strict scrutiny. The classification will be upheld only if it is "suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254, 87 L.Ed.2d at 320. Strict scrutiny is also required when laws impinge upon constitutionally protected "fundamental" rights. *Id.* Legislative classifications based on gender call for a heightened standard of review; the classification survives only if it is "substantially related to a sufficiently important governmental interest." *Id.* at 441, 105 S.Ct. at 3255, 87 L.Ed.2d at 321. Certain restrictions beyond a person's control, such as illegitimacy, are also subject to heightened review. These restrictions "will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest." *Mills v. Habluetzel*, 456 U.S. 91, 99, 102 S.Ct. 1549, 1554, 71 L.Ed.2d 770, 777–78 (1982). Finally, equal protection challenges that do not involve suspect classifications or fundamental rights are subject to "rational basis" review. *Heller v. Doe*, 509 U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257, 270 (1993). Under this standard, a discriminatory classification is presumed valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.*

[6] The Ninth Circuit has previously held that homosexuals are not a suspect or quasi-suspect class for equal protection purposes, and that classifications based on homosexuality are entitled only to rational basis review. *High Tech Gays*, 895 F.2d at 571. In this case, the parties agree that the rational basis standard of review applies to plaintiff's equal protection challenge.

### 2. *Rational Basis Review*

■ Rational basis review is a two-step process. *Jackson Water Works, Inc. v. Public Utilities Comm'n*, 793 F.2d 1090, 1094

(9th Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987). Initially, the court must determine whether the challenged classification serves a legitimate governmental purpose. If the court answers this question in the affirmative, the court must then determine whether the discriminatory classification is rationally related to the achievement of that legitimate purpose. A discriminatory classification that is based on prejudice or bias is not rational as a matter of law. *See Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421, 426 (1984) (mother could not be denied custody of her child based on social disapproval of her interracial marriage); *Cleburne,* 473 U.S. at 448, 105 S.Ct. at 3259, 87 L.Ed.2d at 326 (city could not require a special use permit for group home for the mentally retarded where the requirement was based on prejudice).

The defendants contend that Army Regulation 135–175 serves the government's legitimate interest in maintaining the readiness and combat effectiveness of its military forces. Plaintiff does not dispute that this is a legitimate governmental purpose. Thus, the Court can proceed to the second step of its rational basis analysis and determine whether the government's exclusion of homosexuals from military service is rationally related to this legitimate governmental purpose.

Before proceeding with this analysis, however, the Court must resolve three preliminary issues: (a) the appropriate level of deference to accord to military decisions; (b) the viability of the standard of review applied in *Pruitt v. Cheney,* 963 F.2d 1160 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992), following *Heller v. Doe,* 509 U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257, 270 (1993); and (c) whether, for purposes of equal protection analysis, there is a meaningful distinction between homosexual orientation and homosexual conduct.

### a. Deference to the Military

The Constitution confers broad powers on the President and Congress to raise and support armies, provide and maintain a naval force, and promulgate rules governing and regulating both land and naval forces. Tra-ditionally, courts have recognized the Constitution's mandate by according significant deference to the "considered professional judgment" of military officials regarding the composition of the armed forces. *Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). "While it is clear that one does not surrender his or her constitutional rights upon entering the military, the Supreme Court has repeatedly held that constitutional rights must be viewed in light of the special circumstances and needs of the armed forces." *Beller v. Middendorf,* 632 F.2d 788, 810 (9th Cir.1980). As the Supreme Court has reflected:

> "[It] is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches."

*Rostker v. Goldberg,* 453 U.S. 57, 65–66, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478, 487 (1981) (quoting *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973)). Furthermore, "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities." *Beller,* 632 F.2d at 811.

In view of this standard, the Court must be particularly careful not to substitute its own judgment as to what is "desirable" or its own evaluation of what the executive branch may have intended by a given policy. The Court is also mindful, however, that there is not and must never be a "military exception" to the Constitution. Indeed, courts have been willing to defer to the military only within the confines of ordinary constitutional analysis. *See Rostker,* 453 U.S. at 67, 101 S.Ct. at 2653, 69 L.Ed.2d at 488 (deference to the judgment of other branches in the area of military affairs does not require abdication of "ultimate responsibility to decide constitutional question"). This principle applies with even greater force to equal protection claims since it has traditionally been the domain of the federal courts to scrutinize classifications challenged on equal protection grounds.

This Circuit, in *Pruitt,* 963 F.2d at 1166–67, recognized that deference to the military does not preclude judicial review of military decisions. In *Pruitt,* the plaintiff, a former Army Reserve officer who was discharged because she acknowledged her homosexual orientation, sued to be reinstated. The trial court dismissed the claim, holding that the Army's determination that homosexuality is incompatible with the military mission was entitled to substantial deference. The Ninth Circuit reversed and remanded, holding that the plaintiff had stated an equal protection claim. The court rejected the Army's contention that the court should defer to military judgment and uphold its regulation "without a record to support its rational basis." *Id.* at 1167. The court reasoned that:

> We readily acknowledge, as we must, that military decisions by the Army are not lightly to be overruled by the judiciary. That admonition, however, is best applied in the process of judging whether the reasons put forth on the record for the Army's discrimination against Pruitt are rationally related to any of the Army's permissible goals.

*Id.* at 1166 (citations omitted). The *Pruitt* court further stated that if it were to defer to military judgment by affirming the district court's dismissal of Pruitt's complaint, without any supporting factual record, it would "come close to denying reviewability at all." *Id.* at 1167. Thus, simply labeling the government's decision as "military" does not prevent a meaningful review of the decision to discharge the plaintiff because she is a homosexual.

Although this Court must give appropriate deference to the military decisionmaking process, the Court must also review the reasons provided by the defendants to determine whether the classification is "rationally related to any of the Army's permissible goals." *Id.* at 1166.

### b. Scope of Rational Basis Review

The parties in this case dispute the proper standard for review of government policy under the rational basis test. Plaintiff relies on *Pruitt,* and asserts that the defendants have the burden to demonstrate with facts on the record that the challenged policy is rational and legitimate. The *Pruitt* Court, in rejecting the Army's argument that it could discharge Pruitt "without any justification in the record" for the policy, stated that "[a]ssuming that Pruitt supports her allegations with evidence, we will not spare the Army the task, ... of offering a rational basis for its regulation, nor will we deprive Pruitt of the opportunity to contest that basis." *Id.* The court then remanded the case for development of a factual record and a determination of whether the Army's discriminatory regulation was "rationally related to a permissible governmental purpose." *Id.* at 1167.

The defendants argue that "the continuing validity of *Pruitt* is undercut" by *Heller.* Defendants' Memorandum of Points and Authorities (docket no. 59) at 13. At oral argument, the Government further contended that *Pruitt* was "superseded" and "rendered moot" by *Heller.* Tr. April 20, 1994 Hearing (docket no. 93) at 25. Defendants contend that under *Heller,* they have no burden to submit evidence justifying the challenged policy and this Court may reject plaintiff's equal protection claim as a matter of law, without considering any such evidence.

In *Heller,* 509 U.S. ——, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993), plaintiffs challenged a Kentucky statute that mandated a higher burden of proof in involuntary commitment proceedings for mentally ill persons than for mentally retarded persons. Plaintiffs claimed that this distinction lacked a rational basis.[7] The Supreme Court rejected plaintiffs' argument that the statutory distinctions were irrational, finding that the State had "rationally advance[d] a reasonable and identifiable governmental objective." *Id.,* 509 U.S. at ——, 113 S.Ct. at 2648, 125 L.Ed.2d at 277. The Court further found that the

---

**7.** The Kentucky statute allowed close relatives and guardians to participate as parties in proceedings to commit the mentally retarded but not the mentally ill. The Court noted that mental retardation has its onset during a person's devel-opment, in contrast to mental illness, which may arise or manifest itself after minority when family members have far less knowledge of the medical condition. *Heller,* 509 U.S. at ——, 113 S.Ct. at 2644, 125 L.Ed.2d at 272.

State's proffered rationales provided a rational basis for the statutory classification. *Id.*, 509 U.S. at —, 113 S.Ct. at 2647, 125 L.Ed.2d at 276. In so finding, the Court stated that a challenged discriminatory classification:

"must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." A statute is presumed constitutional, ... and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," ... whether or not the basis has a foundation in the record.

*Id.*, 509 U.S. at —, 113 S.Ct. at 2642–43, 125 L.Ed.2d at 270–71 (citations omitted).

The defendants' contention that *Pruitt*'s vitality has been extinguished by *Heller* is without merit.[8] While it is true that, under *Heller*, the government policymaker is not *required* to submit evidence to justify its policy, and may offer only "rational speculation" to explain the discriminating classification, the Court remains obligated to determine whether there is a rational basis for the policy. Otherwise, it would not have been necessary for the *Heller* court to examine the assumptions underlying the Kentucky statute. If the Government's position were correct, the *Heller* Court could have simply upheld the statute as a matter of law, without any inquiry into its rationality. In fact, the *Heller* Court closely examined the State's asserted bases for the differential treatment of the two classes and found that there were plausible rationales for each of the statutory distinctions challenged in the case. The Court concluded that, "even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation." *Heller*, 509 U.S. at —, 113 S.Ct. at 2643, 125 L.Ed.2d at 271.

The continued vitality of *Pruitt*, following *Heller*, is further demonstrated by *Jackson v. Brigle*, 17 F.3d 280 (9th Cir.1994), a sovereign immunity case, where the Ninth Circuit stated in dicta at the end of its opinion:

The *Pruitt* and *High Tech Gays* cases, upon which the district court relied, do stand for the proposition that if the Government discriminates against an individual on the basis of homosexuality and does not demonstrate a rational basis for doing so, it will have violated that individual's constitutional rights.

*Id.* at 284.

■ *Heller* did not address the proper scope of a court's rational basis review where, as here, the plaintiff alleges the governmental policy at issue is based solely on prejudice. If the policy is shown to be based solely on prejudice, it cannot survive rational basis review. *Cleburne*, 473 U.S. at 450, 105 S.Ct. at 3259, 87 L.Ed.2d at 327.

In a recent district court case in this circuit, *Dahl v. Secretary of the United States Navy*, 830 F.Supp. 1319 (E.D.Cal.1993),[9] the court rejected the same arguments made by the government here. Dahl was discharged from the Navy because he admitted during an official interview that he was a homosexual. The *Dahl* court concluded that:

In sum, there is no support for defendants' argument that the court must accept without question defendants' proffered bases for the homosexual exclusion policy without analyzing the relevant evidence and determining whether the policy is motivated by prejudice against homosexuals.

*Id.* at 1327.

■ In *Dahl*, as in this case, each party moved for summary judgment on the plaintiff's equal protection claim and both offered evidence in support of their respective motions. The *Dahl* court considered the par-

---

8. The Government contended at oral argument that under *Heller* no review of the rational basis for the Army regulation is necessary because "we are completely free to rely on rational specula-

tion unsupported by empirical data or evidence." Tr. April 20, 1994 Hearing (docket no. 93) at 26.

9. *Dahl* is currently on appeal.

ties' respective burdens of production under Rule 56 as to the policy's rationality or irrationality under the *Heller* standard, and concluded:

> If the evidence, construed in the light most favorable to defendants, shows that there is *no* reasonably conceivable rational basis for the homosexual exclusion policy, and the court cannot conceive of a rational basis (i.e. because it is based solely on illegitimate prejudice), then plaintiff is entitled to summary judgment. Alternatively, if the evidence, construed in the light most favorable to plaintiff, shows that there is *any* reasonably conceivable rational basis for the policy, then defendants are entitled to summary judgment. Finally, if the evidence creates a disputed issue of material fact as to the policy's rationality, then neither party is entitled to summary judgment.

*Dahl,* 830 F.Supp. at 1327. This Court agrees that this is the proper standard to be applied in evaluating the parties' cross-motions for summary judgment on plaintiff's equal protection claim.

### (c) *Orientation v. Conduct*

The undisputed evidence in the record establishes that Cammermeyer was discharged from military service *solely* because she admitted her homosexual orientation. The Government argues, nevertheless, that Cammermeyer's admission that she is a lesbian is reliable evidence of her propensity to engage in homosexual conduct. The Government's position, in sum, is that homosexual "orientation" is equivalent to homosexual "conduct." This is a critical issue for plaintiff because the parties acknowledge for purposes of this litigation that, under *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986),[10] and *Pruitt,* 963 F.2d at 1165, the government may exclude individuals from military service on the basis of homosexual conduct.

The Government cites *Ben–Shalom v. Marsh,* 881 F.2d 454, 464 (7th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990), as support for its position that acknowledgment of homosexual orientation can "rationally and reasonably be viewed as reliable evidence of a desire and propensity to engage in homosexual conduct." In *Ben–Shalom,* plaintiff Miriam Ben–Shalom, a sergeant in the Army Reserve, admitted that she was a lesbian. As a result of this admission, she was discharged from the Army Reserve pursuant to Army Regulation 135–178,[11] which provided for the discharge of any servicemember who "evidenced homosexual tendencies, desire or interest, but is without overt homosexual acts." The trial court found no reason to believe that the plaintiff's admission that she was a lesbian meant the plaintiff was likely to commit homosexual acts, and ordered injunctive relief in plaintiff's favor. The Seventh Circuit reversed, holding that Ben–Shalom's "lesbian acknowledgement, if not an admission of its practice, at least can rationally and reasonably be viewed as reliable evidence" of a desire or propensity to engage in homosexual conduct. *Id.* at 464. The *Ben–Shalom* court, relying on *Bowers,* denied relief, holding that the Army regulation promoted a legitimate governmental interest sufficient to survive rational basis scrutiny. The Government's reliance on *Ben–Shalom,* and other cases cited in the defendants' Opposition to Plaintiff's Motion for Summary Judgment (docket no. 75) at 5, is misplaced.

The Ninth Circuit has recognized a distinction between homosexual status or orientation and conduct. In *Pruitt,* the plaintiff was discharged from the Army because of her public acknowledgment in a newspaper interview that she is a homosexual. She subsequently brought an action to challenge the same Army regulation at issue in this case. The Government argued, citing several cases, that its right to discharge homosexual servicemembers was so firmly supported in the

---

**10.** *Hardwick* involved a due process challenge to a Georgia statute which criminalized sodomy. Hardwick challenged the statute after being discovered engaging in sodomy with another consenting adult while in the privacy of his own home. The Supreme Court held that the Constitution confers no fundamental right upon homosexuals to engage in sodomy.

**11.** This is substantially the same Army regulation challenged by Cammermeyer.

law that any equal protection claim asserted by Pruitt was legally insufficient on its face. In rejecting this argument, the Ninth Circuit distinguished these prior cases, including *Bowers* and other cases relying on *Bowers,* as cases "relating to conduct, not orientation." *Pruitt,* 963 F.2d at 1165–66 n. 4 and 5.[12]

Supreme Court precedents have also recognized a status-conduct distinction in other contexts. In *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the Court struck down a statute criminalizing "status" as a drug addict, absent evidence of drug use, as a violation of the Eighth Amendment prohibition against cruel and unusual punishment. Similarly, in *Powell v. Texas,* 392 U.S. 514, 532, 88 S.Ct. 2145, 2154, 20 L.Ed.2d 1254 (1968), the Court upheld a conviction for drinking in public but disapproved of arrests based solely on status as a chronic alcoholic. Furthermore, Supreme Court precedents prohibit presumptions of criminal conduct based on orientation. *See Jacobson v. United States,* 503 U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (prior conduct does not demonstrate a propensity to engage in identical conduct later made illegal); *Aptheker v. Secretary of State,* 378 U.S. 500, 501–02, 84 S.Ct. 1659, 1661–62, 12 L.Ed.2d 992, 995 (1964) (government may not deny member of Communist Party right to travel based on statutory presumption the individual will compromise national security). These cases stand for the proposition that status and conduct are distinct, and that it is inherently unreasonable to presume that a certain class of persons will violate the law solely because of their orientation or status.

This status-conduct distinction is particularly relevant in the military context, where homosexual conduct by servicemembers is not just discouraged, but is grounds for discipline and, if the conduct is sodomy, criminal charges. The Court notes that the military does not make similar presumptions with regard to other groups.[13]

Plaintiff has also provided the Court with substantial uncontroverted evidence that a distinction between homosexual orientation and homosexual conduct is well grounded in fact. According to Dr. Herek,[14] "no data exist to indicate that lesbians and gay men are less capable than heterosexuals of controlling their sexual or romantic urges, refraining from the abuse of power, or exercising good judgment in handling authority." Herek Decl., ¶ 14. Dr. Herek also states that a person's public identification of his or her sexual orientation does not necessarily imply sexual conduct, past or present, or a future desire for sexual behavior. *Id.* ¶ 8. The plaintiff also relies on the testimony of Dr. Laura S. Brown,[15] who testified that "[t]here is almost no relationship between an individual's orientation and his or her sexual conduct." Brown Decl., ¶ 21. Brown also testified that homosexuals are more likely to control their sexual urges than heterosexuals because they have less opportunity to express their sexuality and have to exercise great discretion in choosing settings and persons who are likely to be receptive, and circumstances that are not likely to result in career problems. Brown Decl., ¶ 22.

Significantly, the very policy challenged by plaintiff in this case recognizes a distinction between orientation and conduct. Dr. Law-

**12.** In the present case, the Government also relies on *Dronenburg v. Zech,* 741 F.2d 1388 (D.C.Cir.1984), to support its argument that homosexual orientation equals homosexual conduct. However, whether any agency of the federal government can discriminate against individuals merely because of sexual orientation remains an open question in the D.C. Circuit. *See Doe v. Casey,* 796 F.2d 1508, 1522 (D.C.Cir. 1986), *aff'd in part and rev'd in part sub. nom., Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Steffan v. Aspin,* 8 F.3d 57, 62 (D.C.Cir.1993), *vacated for reh'g en banc,* (D.C.Cir. January 7, 1994). Moreover, the Ninth Circuit distinguished *Dronenburg* in *Pruitt,* 963 F.2d at 1165 n. 4.

**13.** The military does not discharge servicemembers who identify themselves as alcoholics or drug addicts. *See* OPNAVINST 5350.4B (titled "Alcohol and Drug Abuse Prevention and Control"), Himes Decl., Ex. 7. Rather, the military requires actual evidence of substance abuse or that the individual's status impairs his or her ability to function in the military. *Id.*

**14.** Dr. M. Herek is an Associate Research Psychologist at the University of California at Davis.

**15.** Dr. Laura S. Brown is a clinical professor of psychology at the University of Washington.

rence J. Korb, the former Assistant Secretary of Defense (Manpower, Reserve Affairs, Installation and Logistics) who was responsible for implementing the policy at issue in this case, testified by declaration that:

> As the policy clearly states, the purpose was to authorize the military to discharge gay servicemembers who demonstrate a propensity to engage in homosexual conduct. The policy was never intended to authorize the military to discharge someone simply based on his or her status—absent any evidence of conduct. To the contrary, conduct was the real focus of the policy.
>
> A servicemember's own admission of being gay—absent any indication of her propensity to engage in homosexual conduct—is simply not sufficient grounds for discharging her under the existing policy. Discharging someone based on his or her status is irrational and has no basis in furthering the military mission. The policy I authorized should not be construed as authorizing such an irrational outcome.

Korb. Decl., ¶ 5.

■■■ The Court concludes that plaintiff's acknowledgment of her lesbian orientation itself is not reliable evidence of her desire or propensity to engage in homosexual conduct. The Court therefore concludes that there is no rational basis for the Government's underlying contention that homosexual orientation equals "desire or propensity to engage" in homosexual conduct.

### 3. Rational Review Analysis of the Equal Protection Claim

Plaintiff was discharged from service in the Washington State National Guard pursuant to Army Regulation 135–175 and Department of Defense ("DOD") Directives 1332.14 and 1332.30, 32 C.F.R. Part 41, Appendix A, 46 Fed.Reg. 9571 (Jan. 29, 1981). Army Regulation 135–175 defines homosexual as "a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts." 32 C.F.R. Part 41, Appendix A, 46 Fed.Reg. 9571, 9577 (January 29, 1981). The regulation requires the discharge of any member of the service who has: (1) "engaged in, attempted to engage in, or solicited another to engage in a homosexual act;"[16] or (2) "stated that he or she is a homosexual or bisexual unless there is a further finding that the member is not a homosexual or bisexual." Id., 46 Fed.Reg. 9571, 9577–78. The plain language of the regulation makes clear that the policy targets not only individuals who engage in homosexual conduct but also individuals who merely acknowledge their homosexual orientation. This litigation does not challenge the classification of persons who engage in homosexual conduct, and the constitutionality of laws forbidding such conduct is not at issue here. Rather, this litigation concerns the exclusion of individuals from military service solely on the basis of homosexual status or orientation.

The Government contends that the rational basis for the Army's policy of excluding homosexuals is evident from the policy itself and from legislative findings made in connection with the military's new "don't ask, don't tell" policy, effective November 1993. Because the policy is rational on its face, the Government argues, no further judicial inquiry into the policy's rationality is necessary or appropriate.

The regulation, at 32 C.F.R. Part 41.13, provides that homosexuality is incompatible with military service. The regulation provides that the presence of homosexuals in the military environment: (1) seriously impairs the accomplishment of the military mission; (2) adversely affects the ability of the armed forces to maintain discipline, good order and morale; (3) seriously impairs the military's ability to foster mutual trust and confidence among servicemembers; (4) adversely affects

---

**16.** Discharge is not required under these circumstances, however, if there are findings that: (i) such conduct is a departure from the member's usual and customary behavior; (ii) such conduct under all the circumstances is unlikely to recur; (iii) such conduct was not accomplished by use of force, coercion, or intimidation by the member during a period of military service; (iv) under the particular circumstances of the case, the member's continued presence in the Service is consistent with the interest of the Service in proper discipline, good order, and morale; and (v) the member does not desire to engage in or intend to engage in homosexual acts. 46 Fed. Reg. 9571, 9578 (January 29, 1981).

the military's ability to insure the integrity of the system of rank and command; (5) impairs the military's ability to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy; (6) adversely affects the military's ability to recruit and retain members of the armed forces; (7) adversely affects the ability of the armed forces to maintain the public acceptability of military service; and (8) seriously impairs the military's ability to prevent breaches of security. 46 Fed.Reg. 9571, 9577 (January 29, 1981).

Recently, Congress made fifteen express findings in support of its new policy concerning homosexuals in the armed forces. *See* 10 U.S.C. § 654(a)(1)–(15). The Government argues that these findings also support the exclusion from military service of "persons who demonstrate a propensity or intent to engage in homosexual acts" under the policy at issue in this case.[17] One such finding, cited by the Government, is that the presence of such persons in the military "would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654(a)(15).

Notwithstanding the Government's arguments to the contrary, this Court is not required to accept the justifications in the regulation or the legislative findings at face value. Rather, the Court must determine if these justifications provide a rational basis for the challenged policy. Both parties have submitted substantial evidence concerning the rationality or irrationality of the military's policy. Under these circumstances, the Court should review the entire record to determine whether the proffered bases for the Government's policy are rational or motivated solely by prejudice against homosexuals.

The Government relies heavily upon the professional military judgment of this country's military leaders that the presence of homosexuals in the military will adversely affect the morale, good order and discipline of the military. The Government cites the testimony of General Colin Powell in hearings before the Senate Armed Service Committee in July, 1993 that:

> Open homosexuality in units is not just the acceptance of benign characteristics such as race or color or background. It involves matters of privacy and human sexuality that, in our judgment, if allowed to exist in the force would affect the cohesion and well-being of the force.

*Hearing to Receive Testimony on DOD Policy on Service of Gay Men & Lesbians in the Armed Forces: Hearing Before the Senate Armed Services Comm.*, 103d Cong., 1st Sess. (July 20, 1993) (hereinafter "*Senate Hearing*"), Glass Decl., Ex. T, at 25. The Government also relies on the testimony of various military officials who testified before the Armed Services Committee, including Generals Mundy, Sullivan, and McPeak, Admiral Kelso, and former Secretary of Defense Les Aspin. *See* Glass Decl., Ex. T, at 29–37, 86, and 94. The Court concludes, however, that the testimony of these officials merely restates the justifications listed in the Army regulation.

Most notably, the defendants offer the Rule 30(b)(6) deposition testimony of Major General John P. Otjen and former Assistant Secretary of Defense Edwin Dorn. General Otjen was a member of the Military Working Group ("MWG") that studied the issue of homosexuals in the military and reported its findings to the Secretary of Defense in June, 1993.[18] *See* Summary Report of Military

---

**17.** The Court may consider relevant factfinding by Congress as evidence in determining whether the Army's regulations possess a rational basis. *See generally EEOC v. Boeing Co.*, 843 F.2d 1213, 1217 (9th Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988). Both parties rely on the Congressional findings in the new policy, and neither party has filed a formal objection to the other party's use of this factfinding as evidence.

**18.** The MWG Report made findings as to each of the rationales stated in the Army regulation, with the exception of the security risk rationale, for the purpose of recommending to the President a new policy on homosexuals in the military that would "compl[y] with the President's direction to end discrimination while maintaining high standards of combat effectiveness and unit cohesion." *See* Memorandum for the Secretary of Defense, Attached to MWG Report, Otjen Dep., at Ex. 10.

Working Group (hereinafter "MWG Report"), at 5–7, Otjen Dep., Ex. 10. General Otjen testified that allowing homosexuals in the military would adversely affect unit cohesion[19] and morale. Otjen Dep. 188:5–190:4, 192:19–201:1, 263:10–265:3. Assistant Secretary Dorn testified similarly. General Otjen testified, based on his experience, the experience of members of the MWG, and the experiences of servicemembers who spoke to the MWG, that when a unit is "confronted with a homosexual situation—for lack of a better description—that there is a casting out, if you will, of the individual." *See* Otjen Dep., 194:4–9. Otjen testified that this "casting out," which can destroy unit cohesion, occurs because the persons doing the casting out are afraid of or prejudiced against the homosexual person or feel "let down," "out of surprise." *See* Otjen Dep., 196:14–197:4.

The Government's evidence offers justifications for the policy of excluding homosexuals from military service. Under *Heller,* 125 L.Ed.2d at 271, the burden is on the plaintiff "to negative every conceivable basis which might support" the government's policy. To meet this burden, plaintiff offers evidence to the effect that the rationale, as stated in the Army Regulation and advanced by the Government, has no factual foundation, is contradicted by the government's own studies and evidence, and is based solely on prejudice against homosexuals.

(1) *Incompatibility with Military Service and Interference with Military Mission.* Plaintiff offers evidence that homosexuality is compatible with military service, and in fact, a large number of homosexuals have served and continue to serve in the military with distinction. Plaintiff cites the statements of President Clinton that, "there have been and are homosexuals in the military who serve with distinction," and "there is no study showing them to be less capable or more prone to misconduct." Himes Dec., Ex. 4. Plaintiff also offers the statement of Vice Admiral Joseph S. Donnell, the Commander of the Navy's surface Atlantic Fleet, describing his experience with lesbian servicemembers as follows: "Experience has ... shown that the stereotypical female homosexual in the Navy is hardworking, career-oriented, willing to put in long hours on the job and among the command's top professionals." Foote Decl., Ex. A.

Plaintiff also relies upon numerous military and government studies, such as the 1957 study popularly known as the "Crittenden Report," and a more recent study, commissioned by the military and performed by the Defense Personnel Security Research and Education Center (PERSEREC), known as the PERSEREC Report. These studies establish that gays and lesbians not only serve in the military, but also that the majority of them do so without incident and receive honorable discharges at the conclusion of their service. *See Report of the Board Appointed to Prepare and Submit Recommendations to the Secretary of the Navy for the Revision of Policies, Procedures and Directives Dealing with Homosexuals in the Military,* Himes Decl., Ex. 5 (hereinafter "Crittenden Report"); and Sarbin & Karols, *Nonconforming Sexual Orientations and Military Suitability* (1988), Himes Decl., Ex. 6 (hereinafter PERSEREC Report).

Plaintiff also offers evidence concerning the experience of foreign countries, such as Canada, Australia, France, Israel, Spain, Sweden, the Netherlands, Denmark, Finland, Norway and Japan, all of which allow homosexuals to serve in their armed forces. It is undisputed that the United States Government has commissioned studies of these militaries, and those studies have concluded that "the presence of homosexuals in the military is not an issue and has not created problems in the functioning of military units." *See Homosexuals in the Military: Policies and Practices of Foreign Countries* (1993), Himes Decl., Ex. 8, at 3 (hereinafter "GAO Report"). *See also* the "RAND Report," *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment.* Himes Decl., Ex. 9 at 65–104 (hereinafter "RAND Report") (homosexuals pose no special problems in foreign militaries).

---

**19.** The Congressional findings define unit cohesion as "the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members." 10 U.S.C. § 654(a)(7).

(2) *Effect on Discipline, Good Order, and Morale.* Plaintiff offers evidence demonstrating that this justification is based solely on prejudice. President Clinton has stated that "most military people [are] opposed to lifting the ban because of the feared impact on unit cohesion, rooted in disapproval of homosexual lifestyles," and "those who oppose lifting the ban are clearly focused not on the conduct of individual gay servicemembers, but on how nongay servicemembers feel about gays in general and, in particular, those in the military service." Himes Decl., Ex. 4. Plaintiff also notes that this rationale, as well as virtually every other justification used today to exclude homosexuals from military service, was also used to justify the military's discrimination against African–Americans in World War II. Herek Decl. at ¶¶ 19–22, Ex. I. There is no dispute that the exclusion of African–Americans from military service was based solely on prejudice.

(3) *Unit Cohesion.* Plaintiff relies on the comprehensive analysis of the impact of homosexual servicemembers on unit cohesion contained in the RAND Report. The RAND Report concludes:

> At present, there is no scientific evidence regarding the effects of acknowledged homosexuals on a unit's cohesion and combat effectiveness. Thus, any attempt to predict the consequences of allowing them to serve in the U.S. military is necessarily speculative.

RAND Report, Himes Decl., Ex. 9, at 283.

(4) *Rank and Command.* Plaintiff argues that there is no evidence supporting the defendants' contention that the presence of homosexuals in the military will be detrimental to the military's rank and command structure. Plaintiff offers a statement by the Chief of Naval Personnel in a 1976 memorandum to the Judge Advocate General that, "no empirical proof exists at this time [to support the Navy's contention that] homosexuality has an adverse effect upon the completion of the [military] mission." *See Meinhold v. United States Dep't of Defense,* 808 F.Supp. 1455, 1457 (C.D.Cal.1993). Plaintiff also cites the Crittenden Report, which found that there is no "visible supporting data [to support the conclusion that gays and lesbians]

cannot acceptably serve in the military." Crittenden Report, Himes Decl., Ex. 5, at 5. Finally, plaintiff offers government-commissioned reports on foreign militaries. These reports have concluded, "in all cases where a decision has been made to include homosexuals in the [foreign military] force, the organization's leaders believe that the force's organizational performance is unaffected by that presence." RAND Report, Himes Decl., Ex. 9, at 15; Korb Decl. at 9–10; GAO Report, Himes Decl., Ex. 8, at 3.

(5) *Privacy.* Plaintiff has submitted substantial evidence refuting the privacy rationale. Plaintiff offers, for example, the PER-SEREC Report which concludes that concerns regarding homosexuals invading the privacy of heterosexuals are unfounded because homosexuals, like heterosexuals, are "selective in their choice of intimate partners and in their expression of sexual behavior" and are selective "in observing rules of privacy, in considering appropriateness of time and place, in connecting sexuality with the tender sentiments, and so on." Himes Decl., Ex. 6, at 31.

(6) *Recruitment and Retention of Military Personnel.* According to plaintiff's expert, Dr. Lawrence Korb, the Assistant Secretary of Defense who was directly responsible for military personnel matters between 1981 and 1985, there is no evidence supporting the defendants' assertion that allowing homosexuals to serve in the military will adversely affect recruitment and retention of military personnel. Korb Decl. at. 7. The RAND report similarly concludes that lifting the ban would likely have no effect on recruitment and only nominal effect on reenlistment. Himes Decl., Ex. 9, at 397–407.

(7) *Public Disapproval of Homosexuals in the Military.* Plaintiff submits the RAND Report, which found that depending upon how the question is phrased, approximately 40–79% of the public favors allowing homosexuals to serve in the military. Himes Decl., Ex. 9, at 201–02. Public polls have yielded similar results. Herek Decl. at ¶ 16; Korb Decl. at 6–7. In any event, to the extent public disapproval of homosexual service in the military is based on prejudice, such disapproval would not be a legitimate

basis for the government's policy. *See Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3259, 87 L.Ed.2d at 326.

(8) *Security Risk.* Plaintiff argues that there is no factual support for the security risk rationale.[20] Former Defense Secretary Cheney has essentially admitted this by acknowledging that the military's argument that homosexuals are greater security risks than heterosexuals is a "bit of an old chestnut." Himes Decl., Ex. 14; *Meinhold*, 808 F.Supp. at 1457. *See also* the Crittenden Report, Himes Decl., Ex. 5, at 6; PERSEREC Report, Himes Decl., Ex. 6, Korb Decl., at 6; Brigadier General Evelyn Foote Decl., ¶ 34.

Plaintiff has successfully met her burden of negating the proffered justifications for the government's policy of excluding homosexuals from service by offering uncontroverted evidence that the individual justifications either have no basis in fact or are based solely on prejudice. The Government, for its part, has failed to offer any evidence showing that its justifications are based on anything but prejudice.

An examination of the record demonstrates that the sole motivation for the exclusion of acknowledged homosexuals from military service is prejudice. President Clinton has admitted that opposition to lifting the ban on homosexual service is "rooted in disapproval of homosexual lifestyles," and based on "the fear of invasion of privacy of heterosexual soldiers" and "how nongay servicemembers feel about gays in general and, in particular, those in the military service." Himes Decl., Ex. 4.[21] General Colin Powell has also admitted in testimony before Congress that the policy was originally implemented more than ten years ago "[i]n simple language, to keep homosexuals out of the service." Glass Decl., Ex. T at 111. Dr. Lawrence Korb, the former Assistant Secretary of Defense who was responsible for implementing the policy at issue in this case, testified that:

> Based on my experience in the Pentagon, as a long-time student of national defense policy, and as a retired Navy Captain, I am of the opinion that there is no longer any justification for the armed services' current ban on homosexuals serving in the military. As detailed below, each of the justifications offered in support of this policy is without factual foundation. Moreover, there is substantial evidence that gays and lesbians have served and continue to serve their country as ably as heterosexuals. Sexual orientation simply does not provide a rational basis upon which to exclude a person from military service. On the other hand, to the extent that sexual *misconduct* threatens to undermine the discipline, good order, and morale that is critical to the accomplishment of the military mission, such misconduct can be and is adequately addressed through existing regulations which prohibit such misconduct whether committed by homosexuals or heterosexuals.

Korb Decl. ¶ 6. The uncontroverted evidence establishes that many homosexuals have served, and currently serve, in the military, and that the majority of them do so without incident and receive honorable discharges at the conclusion of their service. *See* Crittenden Report, Himes Decl., Ex. 5; PERSEREC Report, Himes Decl., Ex. 6; Remarks by President Clinton at National Defense University, Himes Decl., Ex. 4; Testimony of General Colin Powell, *Senate Hearing*, Glass Decl., Ex. T, at 23.

The testimony of defendants' own witnesses further demonstrates that the policy is rooted solely in prejudice. Both General Otjen and former Assistant Secretary of Defense Dorn admitted in their depositions that the defendants have *no facts* supporting any of the stated rationales.[22] *See* Otjen Dep., at 54, 68–79, 287–91, 307–14; Dorn Dep., at

---

20. Defendants would appear to concede this, as the new "don't ask, don't tell" policy, as codified in 10 U.S.C. ¶ 654(a), does not include this rationale.

21. Assistant Secretary of Defense Dorn testified that President Clinton's statements reflect the views of the Department of Defense. Dorn Dep. at 31:1–9.

22. Defining "facts" as statistics, scientific studies, and reports rather than opinions and anecdotes.

190–92 (as to new policy), 199–200 (as to old policy). In addition, and more compelling, both witnesses testified to the effect that the government's objection to homosexual service is based solely on the fears and prejudices of heterosexual servicemembers.

General Otjen was asked hypothetically whether, if everyone in the military had no fear or prejudice against homosexuals and did not morally disapprove of the homosexual lifestyle, there would be any problem with unit cohesion in the military as a result of permitting open homosexuals to serve. *See* Otjen Dep., at 226:2–10. While General Otjen had difficulty accepting this assumption, he agreed that if that assumption were true, there would be no problem with unit cohesion. *See* Otjen Dep. at 226:4–233:13; *see also* Otjen Dep. at 192:3–15, 234:8–237:14, 262, 263–264:14, 264:15–266:3 (testifying to the same effect regarding the rank and command, privacy, morale, and retention rationales). General Otjen also admitted during his deposition that he had no facts to support the finding in the MWG's Report that "the presence of open homosexuals would in general polarize and fragment the unit and destroy the bonding and singleness of purpose required for effective military operation." *See* Otjen Dep. at 192:19–193:5.

Former Assistant Secretary of Defense Dorn testified similarly. For example, Dorn admitted that he was accurately quoted as saying, "[a]s with the racial desegregation of the military, much of the resistance to gays is grounded in fear and in prejudice." *See* Dorn Dep. at 133:3–9, Ex. 7, at 3. Secretary Dorn also testified that the problems with unit cohesion and rank and command cited in the policy were based on anticipated negative reactions of heterosexual servicemembers to homosexuals and a "general spirit of ill ease within the unit." *See* Dorn Dep. at 197:1–4; 221:12–17; 225:3–12. Although Dorn emphasized that the policy excluding homosexuals from service was based on the personal experiences of military professionals with open homosexuals in their units, he admitted that the sum of these personal experiences was

that "many individual soldiers don't want to be around gays." Dorn Dep. at 194:14–18. Other problems with homosexual service cited by Dorn, such as lovers' quarrels, involve matters of homosexual conduct, rather than homosexual orientation or status. Dorn Dep. at 196:10–14. *See also* Dorn Dep. at 159:7–14; 186:12–21.

Defendants' argument that the Army regulation banning homosexuals from service is based on rational, nonprejudicial reasons is unpersuasive. Defendants' military experts have conceded that their justifications for the policy are based on heterosexual servicemembers' fear and dislike of homosexuals. Mere negative attitudes, or fear, are constitutionally impermissible bases for discriminatory governmental policies. *Cleburne,* 473 U.S. at 448, 105 S.Ct. at 3259, 87 L.Ed.2d at 326. Unsubstantiated presumptions concerning a particular group also constitute prejudice and cannot serve as the rational basis for a discriminatory governmental policy. Thus, to the extent the Government's policy is based on the unfounded presumption that servicemembers with a homosexual orientation will engage in proscribed homosexual conduct,[23] the policy is not rationally based. This Court cannot defer to military decisions based solely on prejudice against a particular group. *Id.* The defendants have not submitted any evidence that supports any other basis for the policy.

Certainly, the undisputed evidence in this case relating to Colonel Cammermeyer's service strongly supports the conclusion that acknowledged homosexuality is not incompatible with military service. Cammermeyer served in the Army and the Washington State National Guard with distinction. She was a highly-trained, decorated and dedicated officer in the military. The events that gave rise to her discharge involved her quest to achieve the position of Chief Nurse of the National Guard Bureau. After she disclosed her lesbian status in April 1989, she continued to perform her military duties for over three years until her discharge. Her final evaluation, dated July 31, 1992, provides in

---

**23.** This Court has already concluded that the Government's presumption has no foundation in law or fact.

part that, "[t]his officer is exemplary in her dedication," that she "has clearly demonstrated outstanding administrative and technical skills" and that "Colonel Cammermeyer's strong leadership has been a key element in improving WAARNG medical readiness." Cammermeyer Decl., Ex. D at 1–3. The rating officer described Cammermeyer in the professionalism section of her final evaluation as "the most knowledgeable military nurse with whom I have had the pleasure to work," and the senior rater described her as having continued to serve the Washington Army National Guard "with dedicated professionalism." It is ironic that after over three years as an acknowledged homosexual servicemember, Cammermeyer was evaluated as having "the potential to assume responsibility at NGB level as Chief Nurse," yet she was discharged because of the alleged incompatibility of her sexual orientation with military service. *Id.*

 In conclusion, viewing all the evidence in the light most favorable to the Government, the Court must conclude that the rationales offered by the Government to justify its exclusion of homosexual servicemembers are grounded solely in prejudice. Under *Palmore* and *Cleburne*, this is impermissible. A cardinal principle of equal protection law is that the federal government cannot discriminate against a class in order to give effect to the prejudice of others. The government has discriminated against Colonel Cammermeyer solely on the basis of her status as a homosexual and has failed to demonstrate a rational basis for doing so. The Court holds that plaintiff's discharge pursuant to the regulation banning homosexuals who merely acknowledge their orientation violates plaintiff's equal protection rights under the Fifth Amendment, and the Court grants summary judgment in favor of plaintiff and against defendants on this claim.

## C. Substantive Due Process Claim

 Defendants also move for summary judgment on plaintiff's claim that Army Regulation 135–175 violates the due process clause of the Fifth Amendment. Plaintiff claims that the regulation "mandates discharge solely upon an admission of homosex-

uality, without any nexus between homosexual status and the ability to perform the work duties and responsibilities of the Armed Forces." Complaint at ¶ 6.3. Plaintiff did not move for summary judgment on this issue; however, the parties have briefed and argued the issue. The Court concludes that the issue has been fully and fairly addressed by the parties, and thus the Court may consider the issue as if cross motions for summary judgment were presented. *See Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.1982).

### 1. *Standard of Review*

The due process clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. The due process clause contains both substantive and procedural components. The procedural component requires the government to follow appropriate procedures whenever its agents decide to deprive any person of life, liberty or property. *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (discussing due process clause of Fourteenth Amendment). The due process clause also "contains a substantive component, sometimes referred to as 'substantive due process,' which bars certain arbitrary government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* at 337, 106 S.Ct. at 678, 88 L.Ed.2d at 672 (Stevens, J., concurring). The substantive due process clause "serves to prevent governmental power from being 'used for purposes of oppression.'" *Id.* at 331, 106 S.Ct. at 665, 88 L.Ed.2d at 668 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 277, 15 L.Ed. 372 (1856)). Plaintiff's challenge to Army Regulation 135–175 is based on the substantive component of the due process clause.

 Federal regulations that infringe upon personal rights may be challenged on either substantive due process or equal protection grounds. Although courts approach equal protection and due process analyses differently, there are similarities in the doctrines:

When conduct, either by virtue of its inadequate foundation in the continuing traditions of our society or for some other reason, such as lack of connection with interests recognized as private and protected, is subject to some government regulation, then analysis under the substantive due process clause proceeds in much the same way as analysis under the lowest tier of equal protection scrutiny. A rational relation to a legitimate government interest will normally suffice to uphold the regulation. At the other extreme, where the government seriously intrudes into matters which lie at the core of interests which deserve due process protection, then the compelling state interest test employed in equal protection cases may be used by the Court to describe the appropriate due process analysis.

*Beller*, 632 F.2d at 808 (citing *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)). Thus, when a classification penalizes the exercise of a fundamental constitutional right, heightened scrutiny is required. *Reno v. Flores*, 507 U.S. ——, ——, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16 (1993); *High Tech Gays*, 895 F.2d at 572. On the other hand, where a regulation impairs a lesser interest, there need only be a rational relationship between the challenged regulation and a legitimate governmental purpose. *Flores*, 507 U.S. at ——, 113 S.Ct. at 1448, 123 L.Ed.2d at 18.

### 2. *Due Process Analysis*

Plaintiff asks this Court to hold that the Constitution confers a fundamental right of privacy upon a person to be a homosexual.[24]

24. This issue necessarily encompasses the basic question of whether individuals have a fundamental right under the Constitution to their sexual orientation, whether heterosexual, homosexual or bisexual.

25. Because no authority exists for plaintiff's proposition that homosexual orientation is a fundamental right, she analogizes to Supreme Court precedents that distinguish between "status" and

The United States Constitution does not explicitly mention any right of privacy. The Supreme Court has previously recognized, however, that one aspect of "liberty" protected by the due process clause is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Roe*, 410 U.S. at 152, 93 S.Ct. at 726. *See also Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). The Court has recognized, for example, a right of privacy in personal decisions relating to marriage, contraception, procreation, family relationships and child rearing, education and abortion. *Carey*, 431 U.S. at 685, 97 S.Ct. at 2016, 52 L.Ed.2d at 684. The Supreme Court has refused, however, to find a fundamental right of privacy to engage in homosexual sodomy. *Bowers*, 478 U.S. at 192, 106 S.Ct. at 2844, 92 L.Ed.2d at 146–47.

In seeking to identify constitutional rights entitled to heightened judicial scrutiny, the Supreme Court has limited these rights to rights that are "deeply rooted in this Nation's history and traditions," *Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977), or liberties that are "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). Although plaintiff raises an important issue, it is not clear that either of these formulations would confer a fundamental right of privacy to be a homosexual. Moreover, plaintiff concedes that no court has ever found a fundamental right to be, and to identify oneself as, a homosexual.[25]

The Court need not decide whether plaintiff has a fundamental right to be a homosexual in order to resolve her substantive due process claim. The Court has already held that the Army regulation challenged here is

"conduct" in the criminal context. *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (striking down California statute criminalizing status of narcotics addiction as violative of Eighth Amendment), and *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (upholding conviction for public drunkenness, as distinguished from arrests based on status of being a chronic alcoholic).

based solely on prejudice. As such, it cannot withstand even rational basis review. Regulations based solely on prejudice are irrational as a matter of law and serve no legitimate governmental purpose.

The Government argues that plaintiff's substantive due process claim is foreclosed by *Woodward v. United States,* 871 F.2d 1068 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990). The Government contends that *Woodward,* like the present case, is a homosexual status case, and thus the *Woodward* court's rejection of the plaintiff's substantive due process claim in that case applies here. In *Woodward,* a Naval Reserve officer contended that homosexuality was protected under the constitutional right of privacy, and thus the Navy could not, consistent with the Fifth Amendment, discharge him on the basis of his homosexuality. In analyzing plaintiff's privacy claim, the Court noted that although Woodward had not admitted to homosexual conduct, he had stated that "he was attracted sexually to, or desired sexual activity with, members of his own sex." *Id.* at 1074 n. 6. In view of these admissions, the *Woodward* court distinguished plaintiff's case from cases involving discharge solely on the basis of status.[26] Thus, *Woodward* is not solely a homosexual status case, and the case is distinguishable on those grounds.[27]

The Court holds that plaintiff's Fifth Amendment substantive due process rights were violated by her discharge under Army Regulation 135–175. The Army's discharge of Cammermeyer based solely on her admission of homosexual orientation was not rationally related to the Government's legitimate interest in maintaining the readiness and combat effectiveness of its military forces. The defendants' motion for summary judgment on this claim is denied and the plaintiff is granted summary judgment on this claim.

### D. First Amendment Claim

 Defendants move for summary judgment on plaintiff's claim that the policy banning homosexuals from military service violates her right to freedom of speech and association. The Court concludes that this claim is foreclosed by controlling Ninth Circuit precedent. The Ninth Circuit has held that servicemembers' challenges to military regulations requiring discharge of homosexuals based on the individual's statement that he or she is a homosexual do not implicate First Amendment concerns; the servicemember is not being discharged for his or her speech, but rather for his or her status as a homosexual. *See Pruitt,* 963 F.2d at 1163–64; *Schowengerdt v. United States,* 944 F.2d 483, 489 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992).

In *Pruitt,* an Army Reserve officer challenged on First Amendment grounds the Army Regulations mandating her involuntarily discharge for admitting she was a lesbian. Plaintiff contended that her discharge was based on public statements to a newspaper reporter that she was a lesbian, which she argued was protected expression. *Pruitt,* 963 F.2d at 1163. The court rejected plaintiff's First Amendment arguments, holding that Pruitt was not discharged under Army regulations for her speech, but rather for her status as a homosexual. The court noted that "Pruitt's admission, like most admissions, was made in speech, but that does not mean that the first amendment precludes the use of the admission as evidence of the facts admitted." *Id.* at 1164.

Similarly, in *Schowengerdt,* a Naval Reserve officer who was also a civilian employee of the Navy, challenged on First Amendment grounds his discharge from the Navy. Schowengerdt's discharge was based on his admission of bisexuality, and certain written materials describing his bisexual activities discovered during a search of his office. *Schowengerdt,* 944 F.2d at 485. The court

**26.** The *Woodward* court stated: "While acts of sodomy have not been expressly admitted by Woodward, in view of [his statements, his known association with gays, and his failure to claim celibacy] we need not address the factual situation where there is action based *solely* on 'status as a person with a homosexual orientation.' " *Woodward,* 871 F.2d at 1074 n. 6.

**27.** The Court notes also that the Ninth Circuit, in *Pruitt,* 963 F.2d at 1165 n. 4, has questioned the *Woodward* court's analysis.

held that Schowengerdt's discharge did not violate the First Amendment because "he was not discharged for writing about bisexuality but rather for *being* a bisexual, of which his purely private correspondence was evidence." *Id.* at 489.

Plaintiff cites no precedent in support of her claim under the First Amendment. Further, every court that has addressed this issue has refused to grant relief on First Amendment grounds. *See, e.g., Ben–Shalom*, 881 F.2d at 462; *Dahl*, 830 F.Supp. at 1338. The Court therefore grants defendants' motion for summary judgment on this claim.

## E. Other Claims

Plaintiff's complaint asserts two additional claims: first, that Army Regulation 135–175 is an invalid exercise of executive power, in violation of the doctrine of separation of powers; second, that Army Regulation 135–175 violates the principles of federalism because the United States Constitution reserves to the State of Washington the power to appoint officers in the Washington State National Guard. The Court construes plaintiff's failure to respond to defendants' motion for summary judgment on these claims as a concession that these claims are without merit and therefore grants defendants' motion as to these claims.

## F. Conclusion

All who had the opportunity to serve with Margarethe Cammermeyer agree that she was an outstanding officer and Army Nurse. Her care and professionalism in performing her duties earned her numerous awards and distinctions, including the Bronze Star Medal for distinguished service in Vietnam. Undoubtedly, Colonel Cammermeyer would have continued to serve in the Washington State National Guard, earning the continued respect and admiration of her peers, had she not applied for a top secret clearance to gain admission to the Army War College, and admitted in response to a direct question during her clearance interview that she is a lesbian. That admission led to her discharge from military service.

Colonel Cammermeyer was discharged from the National Guard pursuant to a governmental policy that is based solely on prejudice. Prejudice, whether founded on unsubstantiated fears, cultural myths, stereotypes or erroneous assumptions, cannot be the basis for a discriminatory classification. *Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3259. As the Supreme Court stated in *Palmore*, 466 U.S. at 433, 104 S.Ct. at 1882, "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." Plaintiff is therefore entitled to judgment as a matter of law on her equal protection and substantive due process claims under the Fifth Amendment. Plaintiff is entitled to summary judgment against defendants on her first and third claims and for judgment as follows:

a. For an order requiring defendants to reinstate her to her former position in the Washington State National Guard and to restore to her all rights, honors and privileges of that status;

b. For an order requiring defendants to expunge all record of plaintiff's sexual orientation and her statements, if any, regarding same from any and all records in defendants' possession;

c. For an order enjoining defendants from taking any adverse action against plaintiff by reason of her homosexual status or on account of statements of her homosexual orientation;

d. For an order enjoining defendant from taking any action against plaintiff based on the purported authority of directives or regulations mandating separation from military service by reason of homosexual status or on account of statements of homosexual orientation;

e. For a declaration that defendants' action in separating plaintiff from military service based solely on her declaration of homosexual orientation was unconstitutional;

f. For a declaration that defendants' regulation mandating separation from service by reason of homosexual status or on account of statements of homosexual orientation is unconstitutional; and

g. Costs of suit.

Defendants are entitled to judgment dismissing plaintiff's second, fourth, fifth and sixth claims.

The Clerk of the Court is directed to enter judgment in accordance with this Order.

IT IS SO ORDERED.