652 A.2d 891

**Donald L. DeMUTH, Appellee,**

v.

**Daniel C. MILLER, Appellant.**

Superior Court of Pennsylvania.

Argued June 21, 1994.

Filed Jan. 11, 1995.

Beatrice Dohrn, New York City, for appellant.

Samuel L. Andes, Lemoyne, for appellee.

Before OLSZEWSKI, POPOVICH and JOHNSON, JJ.

POPOVICH, Judge:

This case involves an appeal from the order (reduced to judgment) of the Court of Common Pleas of Cumberland County denying a motion for judgment notwithstanding the verdict and a new trial by the defendant/appellant, Daniel C. Miller. We affirm.

The facts, viewed in a light most favorable to the verdict-winner and granting all reasonable inferences to be drawn

therefrom, reveal that the defendant was hired by the plaintiff, Donald L. DeMuth, in December of 1985 as an independent contractor to do accounting work. In May of 1986, the defendant became an employee of the DeMuth firm as a professional management consultant and signed an employment contract to that effect for one year (June 1, 1986, to May 31, 1987). This business relationship was renewed on a fiscal basis for each of the next four years, but executed copies of employment contracts could be produced for only two of those years. More specifically, the plaintiff could not locate, but recalls signing, a contract dated May 31, 1989, and expiring June 1, 1990. Each of the contracts, save for 1986, contained the following language:

8. *Contingent Note Payable:* If within five years of the termination of this Agreement if the Employee terminates the Agreement or the Employer terminates the Agreement for cause, and the Employee establishes a professional management consulting or accounting firm within a 50–mile radius of any of Employer's current or former clients, he agrees to pay the Employer 125% of the previous 12 months' charges for each of the employer's clients who retain his professional management consulting or accounting services. Cause shall include, but is not limited to, moral turpitude, being charged with a felony, use of illicit drugs, intoxication while working, insulting Employer's family and clients, not working, intentionally working slowly, intentionally losing clients, engaging in sexual activities in the office, and homosexuality.

See Paragraph 8, Reproduced Record at 13a.

On October 17, 1990, the plaintiff called the defendant into the office and terminated his employment because of his appearance on a Harrisburg television station representing a gay and lesbian coalition in violation of Paragraph 8. After leaving the plaintiff's employ, the defendant opened a competing consulting firm and solicited the plaintiff's clients, some of whom (17 in number) changed their business allegiance to the defendant. Once the plaintiff learned of this, the defendant

was notified that such conduct violated the employment agreement. See Paragraph 8, supra.

When the defendant refused to compensate the plaintiff for the loss of business, a two-count complaint sounding in contract and misappropriation of the plaintiff's property rights was filed seeking judgment in excess of $120,000.00. The defendant's reply was an answer denying, inter alia, the existence of a written contract for the last year of his employment, thus negating the effectiveness of Paragraph 8. Under new matter, the defendant averred that his dismissal was premised upon the "homosexual" provision of the employment contract and his television interview concerning a controversial issue (gay and lesbian bashing), the former of which was violative of public policy.

In a counterclaim, the defendant alleged that he had been: wrongfully discharged for appearing on television in support of gay/lesbian rights; defamed when the plaintiff communicated to third parties that he was gay and at the risk of AIDS if a continuing work relationship was contemplated; and contractually interfered with by the plaintiff as to clients.

At the commencement of trial, the defendant argued a motion in limine to exclude any testimony by the plaintiff that the contract continued in effect until the termination date (October 17, 1990) on the ground that "there was a judicial admission in the [plaintiff's] pleadings that it had not been renewed." The plaintiff countered that the provision allowing dismissal for "homosexuality" persisted because of the dealings of the parties. The court agreed with the plaintiff and allowed testimony on the parties' business dealings post-May 31, 1989.

The parties stipulated that damages did not exceed (under the 125% provision of actual loss) $110,000.00 and the defendant's wrongful discharge claim was excluded on the plaintiff's motion for compulsory non-suit. Thereafter, in answer to special interrogatories, the jury held that the parties were bound by the terms of the 1990 Agreement as a consequence of their post–1989 conduct leading up to and encom-

passing the defendant's dismissal (October 17, 1990). Damages were awarded (and later molded by the court) in the amount of $110,000.00. Post-trial motions were denied. This appeal followed and raises three issues, the first of which to be addressed concerns the allegation that the trial court erred in allowing the plaintiff to present evidence in support of his contractual claim when the plaintiff had "judicial[ly] admi[tted] in his complaint that the employment agreement ... was not renewed or extended at its expiration on May 31, 1990."

It is well established that a judicial admission is an express waiver made in court or preparatory to trial by a party or his attorney, conceding for the purposes of trial, the truth of the admission. *Jewelcor Jewelers & Distributors, Inc. v. Corr*, 373 Pa.Super. 536, 542, 542 A.2d 72, 75 (1988). It has the effect of a confessory pleading, in that the fact is thereafter to be taken for granted, so that the opposing party need offer no evidence to prove it and the party by whom the statement was made is not allowed to disprove it. *Jewelcor Jewelers, supra,* at 542, 542 A.2d at 75. *A principal element of a judicial admission is that the fact has been admitted for the advantage of the admitting party,* and consequently, a judicial admission cannot be subsequently contradicted by the party that made it. *Jewelcor Jewelers, supra,* at 543; 542 A.2d at 76. As our Supreme Court stated:

> Pennsylvania has followed this rule since *Wills v. Kane*, 2 Grant 60, 63 (Pa.1853), where the court insisted: *"Where a man alleges a fact in a court of justice, for his advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in the administration of justice."*
>
> *Jewelcor Jewelers, supra,* at 542; 542 A.2d at 75 (quoting *Tops Apparel Mfg. Co. v. Rothman*, 430 Pa. 583, 587–88 n. 8, 244 A.2d 436, 438 n. 8 (1968) (emphasis added).

*Nasim v. Shamrock Welding Supply Co.,* 387 Pa.Super. 225, 563 A.2d 1266, 1267–1268 (1989) (Emphasis added in part).

In the present case, we hold that the averment of fact contained in Paragraph 5 of the plaintiff's complaint (i.e., the

employment contract "was not renewed or extended at its expiration on 31 May 1990") did not constitute a judicial admission as the averment was not advantageous to the plaintiff when viewed in the context of the remaining allegations and damages sought to be recouped. In pertinent part, the complaint reads:

4. Pursuant to an Employment Agreement dated 31 May 1989, Plaintiff employed Defendant. A copy of said Employment Agreement is attached hereto and marked as Exhibit A.

5. *The Employment Agreement between the parties was not renewed or extended at its expiration on 31 May 1990.*

6. Following the expiration of the Employment Agreement between the parties, Defendant continued to be employed by Plaintiff and continued to be paid a salary and other compensation for such employment.

7. On 17 October 1990, Plaintiff terminated Defendant's employment.

8. Following termination of his employment, Defendant solicited a large number of the clients served by Plaintiff's business during the time that Defendant was employed in that business, suggesting and requesting that those clients terminate the services of Plaintiff and retain Defendant to provide those professional services to the clients in the future.

9. As a result of Defendant's solicitation of and contacts with Plaintiff's clients following the termination of Defendant's employment by Plaintiff, several of Plaintiff's clients have terminated Plaintiff's services. Plaintiff believes that many of those clients have now retained the services of Defendant and that Defendant is providing professional accounting and business management services to those clients.

## COUNT I

### CONTRACT CLAIM

10. . . .

444

11. To the extent that the Employment Agreement of 31 May 1989 was in effect in October of 1990, Defendant is bound and obligated by the terms of that agreement.

12. Defendant's employment with Plaintiff was terminated by Plaintiff for cause as such cause is defined in Paragraph 8 of said agreement.

13. Pursuant to Paragraph 8, Defendant owes Plaintiff a sum of money equal to 125 percent of the previous twelve months' charges for each of Plaintiff's clients who retained Defendant to provide professional services for them following his termination.

14. Plaintiff believes that the clients of Plaintiff who are now served by Defendant are those clients listed on Exhibit B which is attached hereto. The previous twelve months' charges for each of those clients is set out next to the clients name on said schedule and totals $98,918.75.

15. Pursuant to Paragraph 8 of the Employment Agreement between the parties, and to the extent said Employment Agreement was still in effect and still binding as of October, 1990, Plaintiff owes Defendant the sum of $123,-648.43.

16. Defendant is indebted to Plaintiff in the sum of $123,648.43. Despite repeated demands by Plaintiff, Defendant had failed and refused to pay said sum.

WHEREFORE, Plaintiff demands judgment against Defendant in the amount of $123,648.43, plus interest from 30 November 1990, plus costs of suit.

Viewed in a vacuum, the allegation in Paragraph 5, supra, would appear to bind the plaintiff to the assertion therein of non-existence of the contractual relationship between the parties. However, reading the complaint as a whole, we find that the "non-renewal, non-extension" averment was tempered by the allegations in the remaining portions of the complaint (which were echoed at the trial as well) that the contractual relationship "continued" between the parties past the 31 May 1989 term of the written and executed agreement of employ-

ment with the payment of wages and benefits for services rendered by the defendant up until dismissal in 1990.

The defendant's homosexual activity triggered his dismissal for cause under the terms of the extended 1989 contract and suit was instituted for his solicitation of the plaintiff's clients consistent with language of the same Agreement continued by the parties' conduct until October 17, 1990.

To hold that the content of Paragraphs 5's "non-renewal" language is a judicial admission foreclosing the plaintiff from looking to Paragraph 8's dismissal for "cause" and compensation proviso of the 1989 written contract flies in the face of *treating something as a judicial admission only if it is advantageous to the admitting party.* Contrast *Nasim,* supra, and compare with *Jewelcor Jewelers & Distributors, Inc. v. Corr,* 373 Pa.Super. 536, 542, 542 A.2d 72, 75 (1988).

Instantly, we fail to discern how it would be beneficial to the plaintiff to treat as an admission the expiration of the contract containing verbiage entitling him to dismiss the defendant for cause and seeking compensation for violation of the non-competition clause. *Id.* Accordingly, given the non-beneficial aspects flowing from labelling Paragraph 5 as an admission (so as to preclude the plaintiff from offering evidence of the defendant's conduct as violative of a contract), we hold that Paragraph 5 does not rise to the level of a judicial admission. *Id.*

The conclusion that the viability of the contractual relationship between the parties was unresolved opened the door for the jury to assess the contradictory versions of conduct and behavior surrounding the renewal procedures practiced by the parties with the formal expiration of a contractual period and the continuation of its terms thereafter. This is consistent with established case law; to-wit:

"[W]hen a contract of employment for a definite time is made and the employee's services are continued after the expiration of the time, without objection, the inference is that the parties have assented to another contract for a term of the same length with the same salary and conditions

of service." *Smith v. Shallcross, et al.*, 165 Pa.Super. 472, 475, 69 A.2d 156, 158 (1949). "If an agent is employed for a specified period of a year or less and thereafter continues in the employment, without further arrangements being made, it ordinarily is inferred that the employment continues upon the same terms and for a similar period as that for which he was first employed." *Id.* at 476, 69 A.2d at 158–159. See also P.L.E. Labor § 9.

*Burge v. Western Pa. Higher Education Council, Inc.*, 391 Pa.Super. 108, 570 A.2d 536, 538 (1990).

It was the defendant's testimony that one-year contracts were signed with the plaintiff in 1986, 1987 and 1988, with no agreement being signed in 1989 and for the period from June of 1990 to October of 1990. Even though the first three contracts contained the "homosexual" provision as "cause" for dismissal, the defendant never confronted the plaintiff (except in passing) with its exclusion since he did not want to jeopardize his employment by making it an issue pivotal to his remaining on the job.

In fact, the defendant testified that no extension of his June 1, 1988, to May 31, 1989, contract was signed because he "wanted to negotiate th[e] issue" of calculating his bonus not on hours worked but on his productivity. This was refuted by the plaintiff, who took the stand and admitted that he could not produce the May 31, 1989, contract, but he swore that such a document was executed by the defendant and he witnessed the signing. N.T. 6/21/93 at 18–19.

Despite the defendant's refutation of an employment contract after May 31, 1989, he remained on the job thereafter until the date of his termination and received wages and benefits during this employment period such that his salary had risen from $32,500.00 to $50,000.00 (plus benefits) for the time in question. Further, both parties agreed that it was not unusual for a formal contract to be signed 4–5 months into the new fiscal year, with increments in pay being made retroactive to June 1st of that work year. *Id.* at 25–26.

For example, after the expiration of the contract on May 31, 1989, it was the defendant's contention that no other contract was signed because the bonus features had to be resolved. This element was agreed upon in February of 1990, with the bonus paid according to its terms. N.T. 6/22–23/93 at 48–51. Thus, the employment relationship continued uninterrupted and its attendant terms and conditions were part and parcel of the work environment up until the defendant's termination date. See *Burge*, supra. As such, we assign no error to the trial court's allowance of testimony on the employment relationship during that period where no written contract could be produced (from May 31, 1989, to the date of the defendant's dismissal), which we find was proper under accepted principles of law concerning the continuation of contracts and their conditions beyond the written period of their existence. *Id.*

The next issue to be proffered relates to the claim that the "contingent note payable" clause of the employment contract is a penalty clause, or, alternatively, an unreasonable restrictive covenant. Our review of the record discloses that this issue was not raised in pre-trial, trial or post-trial motions. Furthermore, the trial court did not address it in its opinion to this Court. Therefore, we find it waived for appeal purposes. See *McGonagle v. Union Fidelity Corp.*, 383 Pa.Super. 223, 556 A.2d 878, 881 n. 3 (1989); see also *Commonwealth v. Sheaff*, 518 Pa. 655, 544 A.2d 1342 (1988), reversing *Commonwealth v. Sheaff*, 365 Pa.Super. 613, 530 A.2d 480 (1987).

The last of the appellant's complaints consists of a general challenge to his termination as violative of public policy, followed by a list of sub-issues aimed at assailing the loss of employment on federal and state constitutional grounds. See Appellant's Brief at i–ii.

The constitutional arguments appear for the first time in the appellant's appellate brief. An examination of the pleadings, pre-trial memoranda, arguments before trial and at the compulsory non-suit and direct verdict stages of the case, as well as in post-trial motions, are devoid of any mention of the constitutional grounds offered in the appellant's appellate brief as justification to entry of judgment notwithstanding the

verdict or a new trial. This lack of presentment of such a theory for relief would normally be fatal to preservation of such grounds on appeal. However, the trial court addressed the constitutional challenges in its opinion. The reason for and timing of such a response by the trial court was the result of "[t]hose arguments [being] first made when Miller filed his brief in support of the post-trial motions, which occurred after he changed counsel." [1] See Appellee's Brief at 6. The trial court, having exercised its discretion in responding to the constitutional issues raised in the defendant's post-trial brief and at oral argument, preserved such claims for appellate review. See *Thatchers Drugs of West Goshen, Inc. v. Consolidated Supermarkets, Inc.*, 391 Pa.Super. 524, 571 A.2d 490, 494 (1990), *reversed on other grounds*, 535 Pa. 469, 636 A.2d 156 (1994), where we observed on this exact issue that:

> ... there has been a shift in this Court's approach to dealing with issues not timely filed below but addressed, nevertheless, by the trial court on their merits (without leave of court being sought and granted in advance of submission).

For example, in *Commonwealth v. Hewett*, 380 Pa.Super. 334, 551 A.2d 1080 (1988), a panel of this Court did not find an issue waived even though it was raised in supplemental post-trial motions without the benefit of leave of court being obtained as required by Pa.R.Crim.P. 1123(a). We did so on the strength of the Supreme Court's reversal of Superior Court treating as waived an issue raised for the first time in supplemental post-trial motions without leave of court being obtained beforehand because the *trial court elected to treat the issue on its merits*. Reliance was had upon the Supreme Court's per curiam reversal order in *Commonwealth v. Sheaff*, 518 Pa. 655, 544 A.2d 1342 (1988), of this Court's panel decision finding waiver in *Commonwealth v. Sheaff*,

---

1. From the record we glean the following sequence of events: 1) June 30, 1993, the defendant's post-trial motions were filed; 2) September 23, 1993, the defendant's attorney's petition for admission *pro hac vice* was granted; 3) November 24, 1993, trial counsel's petition to withdraw and new counsel's entry filed; and 4) December 20, 1993, trial court granted post-trial motions in part.

365 Pa.Super. 613, 530 A.2d 480 (1987). Accord *Common-wealth v. Markovich*, 388 Pa.Super. 244, 247–49, 565 A.2d 468, 470 (1989); cf. *Kurtas v. Kurtas*, 521 Pa. 105, 109, 555 A.2d 804, 806 (1988) (plurality). As such, we will respond to the appellant's claim that the Statute of Frauds precluded the court below from restricting the use it made of its leased premises. In doing so, we would note that the issue is preserved not solely because of its appearance in the appellant's post-trial supplemental brief. Rather, we address the question because of its presence in the supplemental brief, counsel's oral argument on the issue before the trial court *and* the trial court exercising its discretion to address the Statute of Frauds matter.[2] Cf. *Weis by Gasper v. Estate of Ciao*, 521 Pa. 491, 556 A.2d 819 (1989). [Emphasis in original]

Accord *Commonwealth v. Austin*, 428 Pa.Super. 466, 631 A.2d 625 (1993); contrast *Commonwealth v. Metz*, 534 Pa. 341, 633 A.2d 125 (1993).

Despite the appellee's protestation that the trial court did not have the opportunity to digest or respond to the appellant's public policy and constitutional arguments, the trial court's opinion indicates otherwise; to-wit:

The defendant first suggests that the judgment must be entered, notwithstanding the verdict, for the reason that the contract whereby the plaintiff was permitted to fire the defendant for being gay violated either public policy or state and federal constitutions.

Trial Court Opinion, 12/10/93 at 3. The court then proceeded to find meritless the specific arguments raised on the grounds that "there was no factual record made with respect to the due process or public policy claim * * * [and there was no] current legislative or societal consensus on these matters ...

2. Interestingly, the Statute of Frauds issue upon which Superior Court was reversed was the issue Superior Court found preserved even though raised for the first time in the appellant's post-trial supplemental brief, argued at oral argument and addressed by the trial court despite the appellee's waiver contention. The Pennsylvania Supreme Court did not question the propriety of the preservation issue.

justif[ying the court] in defining public policy based on what [the court] thought it should be." *Id.* at 6.

Therefore, consistent with the precept re-confirmed by our Supreme Court in *Sheaff,* supra, and looked to in *Thatcher's Drugs,* supra, to find an issue preserved where raised for the first time in a post-trial supplemental brief *and* addressed by the trial court on its merits, we can do no less here and find the public policy and constitutional issues preserved for appellate scrutiny. *Id.*

It is imperative that we focus on exactly what issue(s) the appellant seeks to have reviewed under the caption of "public policy," as well as the federal and state constitutional assertions, before we may embark on an analysis of the viability of the claim(s) raised. To assist us in this objective, we look to the appellant's appellate brief at 10–11, labelled "Summary Of Argument", which reads in pertinent part:

> This case involves plaintiff's attempt to use the state's power, and the resources of this court, to enforce monetarily, his punitive policy of discrimination. *Not content with having fired a qualified employee solely because he is gay (which decision is not challenged here), plaintiff sought to go further and to employ the courts' assistance in collecting a money judgment provided for in the unconscionable contract clause at issue.*
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> It was defendant's position throughout that even had the contract relied upon by plaintiff been renewed by inference, its terms were unenforceable because the federal and Pennsylvania constitutions do not permit judicial enforcement of DeMuth's blatantly discriminatory interference with Miller's right to practice his profession without regard to his sexual orientation, or any other irrational classification. [Emphasis added]

At first blush, it appears that appellate counsel seeks to invalidate Paragraph 8's 125% penalty provision, which prohibits the appellant from initiating a competitive business within 50 miles of the appellee's clients and within 5 years of leaving

the appellee's employ. "It is the court's enforcement of that penalty [provision] which constitutes state action, and which is at issue in this appeal." *Id.* Yet, the issue is clouded by the appellant linking the enforceability of Paragraph 8 to a form of punishment for his sexual preference under the guise of constitutional law (federal and state) or public policy.

One cannot state that the dismissal aspect of the case is not being challenged, then in the next breath equate the enforcement of a non-competition clause as appears in Paragraph 8 as an endorsement of discrimination premised upon sexual orientation violative of constitutional law and public policy. As a result, we do not read the appellant's position to be one of assailing his termination of employment because of sexual orientation as violative of public policy or constitutional law, be it state or federal in scope. Rather, we interpret the appellant's complaint to consist of a challenge to the enforcement of the non-competition clause as proscribed by public policy, statutory law, or federal or state constitutional law.

To explicate, the money damages awarded the plaintiff were not because the defendant was a homosexual. On the contrary, an award in favor of the plaintiff was made with the jury's finding that the defendant had violated the non-competition clause of the contract by soliciting seventeen (17) clients of the plaintiff. This is the only logical inference to be drawn from the verdict in light of evidence wherein the parties stipulated to money damages of $110,000.00 on the contract claim. See N.T. 6/22–23/93 at 99; Plaintiff's Complaint, Paragraph 13. To hold that the jury could issue damages in the amount stated because the defendant breached the terms of the contract solely for being a homosexual would be at odds with the clear language of the agreement allowing for a 125% penalty payment if the defendant were to compete with the plaintiff within 50 miles and 5 years after terminating his employment.

Because we view the plaintiff's suit as one seeking remuneration for a loss of business attributable to the defendant's solicitation of his clients, which activated Paragraph 8 of the contract allowing for damages of "125 percent of the previous

twelve months' charges for each of Plaintiff's clients who retained Defendant to provide professional services for them following his termination," (see Complaint, Paragraph 13), we focus on the propriety of the non-competition clause. Nevertheless, with the defendant's failure to mount an assault on this segment of the contract at any level of this lawsuit, we find the matter waived. See *McGonagle*, supra.

█ Lastly, we turn to the appellant's contention that this Commonwealth's courts' enforcement of the penalty provision .(restrictive covenant) of the contract constitutes state action violative of the equal protection and due process clause of the federal and Pennsylvania Constitutions.

"A plaintiff suing for an alleged breach of his constitutional rights has an obvious burden of proving the existence of those facts which make out the breach." *Doe v. Gates*, 981 F.2d 1316, 1323 (D.C.Cir.1993). Here, the appellant has pointed to no evidence to show such a breach.[3]

**3.** The appellant cites *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), for the proposition that a state court's enforcement of a penalty provision of a restrictive covenant based on one's race or color constitutes *state action* allowing for the scrutiny of such penalty provision under the federal constitution's Fourteenth Amendment due process and equal protection precepts.

In *Shelley*, homeowners had executed contracts with clauses restricting the sale of their real estate to Caucasians. When some homes were sold to blacks, the remaining homeowners filed suit to enforce the restrictive covenants. The United States Supreme Court noted that the inhibitions of the constitutional provisions applied only to governmental action and not to actions between private property owners. Nonetheless, the Court ultimately ruled that the restrictive covenants constituted a pattern of discrimination violative of the Fourteenth Amendment; to-wit:

We have noted that previous decisions of this Court have established the proposition that judicial action is not immunized from the operation of the Fourteenth Amendment simply because it is taken pursuant to the state's common-law policy. Nor is the Amendment ineffective simply because the particular pattern of discrimination, which the State has enforced, was defined initially by the terms of a private agreement. State action, as that phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms. And when the effect of that action is to deny rights subject to the protection of the Fourteenth Amendment, it is the obligation of this Court to enforce the constitutional commands.

Note 3—Continued

> We hold that in granting judicial enforcement of the restrictive agreements in these cases, the States have denied petitioners the equal protection of the laws and that, therefore, the action of the state courts cannot stand. We have noted that freedom from discrimination by the States in the enjoyment of property rights was among the basic objectives sought to be effectuated by the frames of the Fourteenth Amendment. That such discrimination has occurred in these cases is clear. Because of the race or color of these petitioners they have been denied rights of ownership or occupancy enjoyed as a matter of course by other citizens of different race or color. The Fourteenth Amendment declares "that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color." *Strauder v. West Virginia*, supra, 100 U.S. [303] at 307, 25 L.Ed. 664 [(1879)]. *Only recently this Court has had occasion to declare that a state law which denied equal enjoyment of property rights to a designated class of citizens of specified race and ancestry, was not a legitimate exercise of the state's police power but violated the guaranty of the equal protection of the laws.* Oyama v. California, 1948, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249. Nor may the discriminations imposed by the state courts in these cases be justified as proper exertions of state police powers. Cf. *Buchanan v. Warley*, supra [245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917)].

334 U.S. at 20–21, 68 S.Ct. at 846 (Footnotes omitted; emphasis added). Protections against discrimination in the enjoyment of property rights comes within the ambit of the Fourteenth Amendment; to-wit:

> The Supreme Court has long held that the constitutional guarantee of due process extends to protect property interests, broadly defined as the "interests that a person has already acquired in specific benefits." *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). Property interests in employment are not themselves constitutionally created; rather, they are derived from independent sources, such as statutes, regulations, ordinances, or "existing rules or understandings ... that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709; *Perry v. Sindermann*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). The rules and understandings on which an employee bases his Fifth Amendment claims, however, must create an "objectively reasonable expectation" of continued employment. *Hall v. Ford*, 856 F.2d 255, 266 (D.C.Cir. 1988).

*Doe v. Gates*, 981 F.2d 1316, 1320 (D.C.Cir.1993).

*Shelley* and *Doe*, supra, acknowledge the existence of property rights which may not be infringed by discriminatory action violative of the U.S. Constitution. Instantly, however, the appellant is not complaining about the denial of a property right (employment), an issue the appellant excluded specifically from appellate review in his brief at 9. This restricts the appellant's argument on appeal to the implementation of a penalty provision claimed to be violative of his federal and State constitutional rights to due process and equal protection.

At trial, the plaintiff testified that the defendant was not discharged only because of his sexual predilections. It was the fact that the defendant communicated on a local television station his views concerning a controversial issue (gay and lesbian bashing on behalf of a Harrisburg organization opposed to such conduct). The plaintiff believed that such outspoken remarks by the defendant would be imputed to the business because of the defendant's employee status. Further, clients and prospective clients might be offended by the remarks and choose not to do business with the plaintiff's firm. Also, the plaintiff made reference to his loss of trust in the defendant with regard to business dealings given the defendant's failure to disclose his homosexuality during the 5 years of employment.

At bar, the appellant has not claimed to have been treated discriminatorily because he is a male, but rather because he is a homosexual who chose to publicize his sexual preference. This type of claim is not actionable under any Pennsylvania statute or its constitution and is certainly not in violation of the doctrines of due process and equal protection in the Fourteenth Amendment to the U.S. Constitution. See *Holloway v. Arthur Andersen and Co.*, 566 F.2d 659, 644 (9th Cir.1977); *Acanfora v. Bd. of Education of Montgomery Cty.*, 491 F.2d 498 (4th Cir.1974), cert. denied, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974).

It surely follows that, because the defendant agreed to the terms of his contract for a period of 5 years without objection or renegotiation, he must be held to adhere to its (non-competition) terms, absent any evidence of a clear violation of public policy which we have not detected here. The courts, as extensions of the state, may not intervene to protect employ-

Note 3—Continued

We find that Paragraph 8's penalty section is not at odds with the appellant's constitutional rights. It was triggered with the appellant's dismissal for espousing homosexual views reflective of his employment status. It was not until the appellant set up a competing business against the plaintiff with customers from the plaintiff that suit was instituted in compliance with Paragraph 8. This aspect of the contract is not challenged and was agreed to by the appellant without objection or any attempt to renegotiate its terms. Thus, the appellant will not be heard to complain now of its enforcement.

ees from treatment that is merely arbitrary or unfair, the remedy for which is resignation or renegotiation of the terms of employment. The appellant intended doing the latter but never took the initiative. See *Madsen v. Erwin*, 395 Mass. 715, 481 N.E.2d 1160 (1985).

Further, our review of the record indicates that the appellee's suit was more the product of the appellant's opening a competing business and soliciting some of the appellee's clients in the course of doing so and not because of any sexual predilections of the appellant.

Had the appellee not lost his clients and money to the appellant's competing business, it is unlikely that any lawsuit would have been instituted. See Plaintiff's Complaint, Paragraphs 8, 9, 13–16. But, with the non-competition clause in effect and agreed to by the appellant, enforcement of its terms was proper under the circumstances of this case without violating any public policy or constitutional positions regarding homosexuals and the private sector employment arena. The absence of evidence to the contrary undermines the appellant's request for either judgment notwithstanding the verdict or a new trial.[4]

Judgment affirmed.

OLSZEWSKI, J., files a Concurring Opinion.

JOHNSON, J., files a Concurring and Dissenting Opinion.

**4.** Parenthetically, we would note that the appellant's arguments of discrimination in the work place, directed at gays and lesbians, would be better directed toward the Legislature (the real body politic) to effectuate a change in the treatment of those whose sexual preferences impact upon their work environment. See *Voyles v. Ralph K. Davies Medical Center*, 403 F.Supp. 456 (N.D.Calif.1975); Siniscalco, Gary R., *Homosexual Discrimination in Employment*, 16 Santa Clara L.Rev. 495 (1976).

The altering of societal norms is a process which is incremental at best, but we are not presented with the legal and factual scenario requiring our inquiry into the area to accelerate change which affects homosexuals in the work environment. This will be left for another day where the issues are preserved and articulated with clarity and not requiring this Court to extend itself to reach for issues to decide where none exist in the record as presented on appeal. The appellant's contentions to the contrary are not persuasive.

OLSZEWSKI, Judge, concurring:

I concur in the result.

While I agree with the majority's well-reasoned disposition of the first two issues, I respectfully disagree with the treatment of the constitutional issue. Appellant challenges the trial court's enforcement of a private non-competition agreement on equal protection grounds. Since I believe that court enforcement of this covenant not to compete does not involve any state action in the constitutional sense, I would decline appellant's invitation to reach out and needlessly decide a very difficult and sensitive constitutional issue.

Appellant asserts that judicial enforcement of the covenant not to compete in paragraph 8 of his employment contract would constitute state action, so as to implicate the United States and Pennsylvania Constitutions. For support, appellant cites to *Shelley v. Kraemer* and its progeny. 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). A careful review of the purpose and the holding of *Shelley* leads me to the conclusion that the judicial conduct at issue here has no constitutional dimension.

The doctrine of state action that arose from *Shelley* was effectively capsulized in *Palmore v. Sidoti*, where the United States Supreme Court stated that "[p]rivate biases may be outside the reach of the law, but the law cannot, **directly or indirectly,** give them effect." 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421, 426 (1984) (emphasis added). Thus, in searching for state action, we look for either direct or indirect support, by a court, of a private discrimination or bias. *See id.*

In the most egregious illustration of direct support of private discrimination, *Shelley v. Kraemer*, a court would, in effect, have coerced such discrimination by enforcing a racially restrictive covenant.[1] 334 U.S. at 31, 68 S.Ct. at 845, 92 L.Ed.

1. In *Shelley,* a group of homeowners signed contracts that prohibited the sale of their homes to anyone other than Caucasians. 334 U.S. at 5–6, 68 S.Ct. at 838–39, 92 L.Ed. at 1176–77. When several of the homeowners defied the contracts and sold to African–Americans, the

at 1183. In a similar situation in *Barrows v. Jackson*,[2] the Supreme Court wrote, "[i]f the state may thus punish respondent for her failure to carry out her covenant, she is coerced to continue to use her property in a discriminatory manner, which in essence is the purpose of the covenant." 346 U.S. 249, 253–4, 73 S.Ct. 1031, 1033, 97 L.Ed. 1586, 1594 (1953). These cases illustrate situations where the state action is found in a court's direct, coercive support of private discrimination.

In this case, we have no similar coercion. Analogizing the facts of *Shelley* to this case suggests the following scenario: DeMuth includes a clause in all employment contracts in which he, as the employer, promises to fire any employee found to be a homosexual. After hiring Miller, DeMuth finds out that Miller is a homosexual. DeMuth, however, decides not to fire Miller and another employee sues DeMuth seeking to enforce Demuth's discriminatory promise. If a court enforced DeMuth's promise, it would be coercing private discrimination. Since this hypothetical scenario is not present here, *Shelley* is not directly applicable.

A step further removed is an instance where the court is not coercing one to discriminate, but is directly supporting private discrimination by enforcing a direct penalty against an individual based on discriminatory bias. Under *Palmore*, this kind of direct support would still qualify as state action. 466 U.S. at 433, 104 S.Ct. at 1882, 80 L.Ed.2d at 426. This direct support, however, is also not present here.

An example of such direct support would be the following scenario: DeMuth and Miller sign a contract stating that if DeMuth found out that Miller was a homosexual, Miller will refund all of the salary that he received from DeMuth since the date he was hired. If DeMuth then found out about

remaining homeowners sued for an injunction seeking to block the sales. *Id.*

2. In *Barrows*, homeowners sued for damages against a fellow homeowner who initially signed a racially restrictive covenant, but then sought to sell her land in violation of the covenant. 346 U.S. 249, 251–52, 73 S.Ct. 1031, 1032–33, 97 L.Ed. 1586, 1592–93 (1953).

Miller's sexual preference and Miller refused to pay, DeMuth would need to sue under the contract for damages. A court's enforcement of this contract would be an example of direct support of a private bias.

In contrast to this hypothetical contract, the actual contract at issue here does not seek to directly penalize Miller for his sexual preference. Rather, it seeks to directly penalize Miller for his business competition with DeMuth in violation of Miller's written promise not to compete. Thus, court enforcement of this covenant not to compete does not lend direct support or give direct effect to a private bias.

According to *Palmore,* a court also cannot indirectly support or give effect to a private bias. *Id.* This area of indirect support is a delicate one, however, as it was not the intention of the Supreme Court to convert all private actions into state actions based solely on judicial enforcement of a private contract. *See Luria Brothers and Company v. Allen,* 672 F.2d 347, 354 (3rd Cir.1982) (holding that judicial enforcement of a contract cannot convert what would otherwise be a private matter into state action) (citing *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 165, 98 S.Ct. 1729, 1738, 56 L.Ed.2d 185, 199 (1978)); *see also Wilco Electronic Systems v. Davis,* 375 Pa.Super. 109, 114, 543 A.2d 1202, 1205 (1988), *appeal denied,* 520 Pa. 619, 554 A.2d 511 (1988). Therefore, we must be cautious in characterizing a court's involvement as indirect support, lest we transform all private acts into acts of the state. After careful examination of this case with these doctrinal limits in mind, I believe that court enforcement of the covenant not to compete fails to rise to the level of even indirect support for private discrimination.

DeMuth's suit for damages based on the covenant not to compete does not require any court involvement at all in the alleged discrimination. Miller specifically states that he is not challenging the validity of his termination, which admittedly was on the grounds of his homosexuality. Brief for appellant at 10–11. The issue raised is simply whether a court's en-

forcement of a non-competition clause in an employment agreement violates federal or state constitutional law.

The non-competition clause at issue reads:

8. *Contingent Note Payable:* If within five years of the termination of this Agreement if the Employee terminates the Agreement or the Employer terminates the Agreement for cause, and the Employee establishes a professional management consulting or accounting firm within a 50–mile radius of any of Employer's current or former clients, he agrees to pay the Employer 125% of the previous 12 months' charges for each of the employer's clients who retain his professional management consulting or accounting services. Cause shall include, but is not limited to, moral turpitude, being charged with a felony, use of illicit drugs, intoxication while working, insulting Employer's family and clients, not working, intentionally working slowly, intentionally losing clients, engaging in sexual activities in the office, and homosexuality.

R.R. at 13a. Appellee DeMuth admitted that he fired Miller for his alleged homosexuality. That firing, however, is a done deal and Miller is not now challenging it. There was simply no court involvement in Miller's termination.

Court involvement began after Miller's termination. Instead of being asked to enforce any alleged discrimination or illegal termination, this Court is merely being asked to enforce a private, consensual contract clause in which Miller promises not to compete with DeMuth after their employment relationship is over. The clause could have been triggered for any number of "causes", and after any one of the triggers, this Court's involvement would have been the same: enforcing a standard non-competition clause in a private agreement by its stated terms. In terms of the court's enforcement of the clause, the reason appellant was originally fired is not an issue.

If this clause had not listed homosexuality as "cause" and DeMuth had sought to enforce it after firing Miller, then the reasons for Miller's termination would be at issue. We would

then be required to determine whether Miller's sexual preference constituted "cause" for his termination, and this determination would arguably present an instance of indirect support. In the present case, however, the parties have addressed and resolved that issue privately. This Court need only enforce Miller's promise not to compete with DeMuth if he were to quit or be fired for cause. By enforcing this promise, we are not expressing approval of the reasons for Miller's termination. We are simply saying that Miller, like anyone else, homosexual or heterosexual, must abide by his own written promise not to compete with his ex-employer for a certain number of years. I believe that under these circumstances, a court's enforcement of the bargained-for economic rights of the parties does not constitute indirect support for private discrimination. Thus, even if we were to assume that discrimination on the basis of sexual preference violates equal protection, there is no state action and neither the federal or state constitutions are implicated. I concur in the majority's result, but feel that the constitutional discussion was unnecessary.

JOHNSON, Judge, concurring and dissenting.

In this action for breach of an employment contract, Daniel C. Miller appeals from the judgment entered on a jury verdict in favor of Donald L. DeMuth.

On appeal, Miller argues that the trial court erred in (1) allowing DeMuth to present his contract claim despite De-Muth's judicial admission that the employment agreement expired before Miller's termination; (2) enforcing the contingent note payable clause because it was either a penalty clause and, thus, void as against public policy, or an unreasonably restrictive covenant; and (3) using its police powers to enforce a contractual agreement penalizing Miller because he is a homosexual. I agree with the conclusion of my colleagues that Miller's first two arguments are without merit for the reasons given in Judge Popovich's Opinion. However, as to the resolution of Miller's third argument, I must respectfully dissent. In my judgment, court enforcement of the contingent note payable clause, which was triggered by the operation of a

facially discriminatory termination provision, would violate the Equal Protection Clause of the United States Constitution.

The facts of the case are as follows. In 1985, DeMuth employed Miller at his professional management consulting firm in Camp Hill, Pennsylvania. From 1986 through 1989, the parties entered into written, yearly employment contracts, each containing the following provision:

8. *Contingent Note Payable.* If within five years of the termination of this Agreement if the Employee terminates the Agreement or the Employer terminates the Agreement for cause, and the Employee establishes a professional management consulting or accounting firm within a 50–mile radius of any of Employer's current or former clients, he agrees to pay the Employer 125% of the previous 12 months' charges for each of the Employer's clients who retain his professional management consulting or accounting services. Cause shall include, but is not limited to, ... homosexuality.

Complaint, Plaintiff's Exhibit A, at 12; R.R. at 272a. *See also* N.T., June 21, 1993, at 16–18.

In late September, 1990, Miller was interviewed by a television reporter in Harrisburg where he and others had gathered to voice concern over an alleged incident of anti-homosexual violence. As a result, DeMuth learned that Miller had declared that he was a homosexual. In October, 1990, he terminated Miller's employment because of Miller's professed homosexuality. N.T., *supra,* at 33–34, 36, 58, 60–61, 63, 66–67. Subsequently, DeMuth wrote to Miller's former clients, informing them that Miller was terminated because he was a homosexual. He also suggested that they consider obtaining an HIV test if they were contemplating continued interaction with Miller.

Thereafter, Miller opened a practice and successfully solicited business from some of DeMuth's former clients. DeMuth filed suit, seeking enforcement of the contingent note payable clause providing for liquidated damages for Miller's alleged breach of the noncompetition clause. Following trial, the jury

rendered a verdict for DeMuth, upon which judgment was entered. Miller filed post-trial motions seeking, among other things, entry of judgment notwithstanding the verdict. His post-trial motions, in relevant part, were denied, and this appeal followed.

Miller contends that the court's enforcement of the disputed contractual provision constituted state action for constitutional purposes, whereby his right to equal protection of the laws, guaranteed under the Fourteenth Amendment of the United States Constitution, was violated. For the reasons set forth below, I agree.

The Fourteenth Amendment, in pertinent part, provides:
No State shall ... deny to any person within its jurisdiction the equal protection of the laws.
U.S. Const. amend. XIV, § 1. Because "[t]hat Amendment erects no shield against merely private conduct, however discriminatory or wrongful," *Shelley v. Kraemer,* 334 U.S. 1, 20, 68 S.Ct. 836, 842, 92 L.Ed. 1161, 1180 (1948), it must first be determined whether there was state action in the present case.

It is well-settled that judicial enforcement of private contracts, where such enforcement furthers private discrimination, constitutes state action and may result in a denial of equal protection. *Shelley, supra; Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Fleming v. Mack Trucks, Inc.,* 505 F.Supp. 169, 171 n. 4 (E.D.Pa.1981). This form of state action is found, not in cases "in which the States have merely abstained from action, leaving private individuals free to impose such discriminations as they see fit[,] but "[r]ather, [in] cases in which the States have made available to such individuals the full coercive power of government to deny" another equal protection of the laws. *Shelley, supra,* at 31, 68 S.Ct. at 845, 92 L.Ed. at 1183.

In *Shelley,* property owners asked the Court to enforce a racially restrictive covenant. The Court found that, while private, consensual adherence to discriminatory covenants would not implicate the Fourteenth Amendment, state action

within the meaning of the Fourteenth Amendment *is* present where the purposes of those agreements can be secured only by state court enforcement. The *Shelley* Court then held that the state, through court enforcement of the discriminatory covenant, had denied the petitioners equal protection of the laws.

Since that decision, courts have found *Shelley* 's interpretation of state action applicable in cases not involving racial classifications. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (enforcement of union-shop agreement); *Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (determining right to occupancy of religious cathedral); *Casa Marie, Inc. v. Superior Ct. of Puerto Rico,* 988 F.2d 252 (1st Cir.1993) (challenge by elderly and disabled to zoning ordinances and restrictive covenant); *United States v. Wilson,* 922 F.2d 1336 (7th Cir.) (enforcement of plea bargain coerced by third party), *cert. denied,* 502 U.S. 850, 112 S.Ct. 155, 116 L.Ed.2d 120 (1991); *Ahmad v. Wigen,* 726 F.Supp. 389 (E.D.N.Y.1989) (enforcement of extradition orders to countries where repression may occur), *aff'd,* 910 F.2d 1063 (2d Cir.1990); *Cosfol v. Varvoutis,* 419 Pa. 28, 213 A.2d 331 (1965) (court interference in religious affairs of church).

In the present case, we are asked to enforce the liquidated damages provision of a covenant not to compete where the triggering of the covenant depended directly on the operation of a facially discriminatory termination clause. According to ¶ 8 of the Employment Agreement, the covenant was to take effect only if Miller were terminated "for cause, . . . includ[ing] . . . homosexuality." The operation of the damages provision, set forth in the same paragraph, cannot, on the facts of this case, realistically be separated from DeMuth's discriminatory termination of Miller. *Cf. Woodward v. United States,* 871 F.2d 1068, 1073 (Fed.Cir.1989) (argument that discharge of a Naval reserve would have occurred absent his homosexuality "fail[ed] to take into account that [his] file would not have reached the reviewing office at all had he not been homosexual

and admitted [to it]"), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990).

Because DeMuth seeks court enforcement of this provision, this is not a case in which the court's "mere acquiescence" in a private action is sought. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 164, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185, 198 (1978). Nor is this a case in which an injured party has asked the court to obstruct private discrimination. Rather, we are presented with the unusual circumstance in which the party wishing to discriminate seeks the court's aid in furthering and, indeed, profiting from his discriminatory plan. This case, like *Shelley,* is one in which the private "injury caused is aggravated in a unique way by the incidents of governmental authority...." *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 622, 111 S.Ct. 2077, 2083, 114 L.Ed.2d 660, 674 (1991) (interpreting *Shelley*).

In addition, it is of no moment that Miller entered into a contract containing the disputed provision. Such was also the case in *Barrows, supra.* In *Barrows,* property owners sought to enforce a racially restrictive covenant against another property owner who had initially agreed to adhere to the covenant, but who later wished to sell the property despite it. The Court found that

> voluntary adherence [to a covenant] would constitute individual action only. When, however, the parties cease to rely upon voluntary action to carry out the covenant and the State is asked to [enforce] the covenant, the first question that arises is whether a court's awarding damages constitutes state action under the Fourteenth Amendment.

*Barrows, supra,* at 253–54, 73 S.Ct. at 1033, 97 L.Ed. at 1594. The *Barrows* Court concluded that the state court's enforcement of the covenant did constitute state action because, with court enforcement, "it becomes not [the owner's] voluntary choice but the State's choice that she observe her covenant or suffer damages." *Id.* at 254, 73 S.Ct. at 1034, 97 L.Ed. at 1594. Similarly, in the present case, "but for the active intervention of the state courts," Miller would be free to

operate his business without paying damages. *See Shelley, supra,* at 30, 68 S.Ct. at 845, 92 L.Ed. at 1183.

Accordingly, pursuant to *Shelley* and *Barrows,* judicial enforcement of the damages provision against Miller, where the provision's operation resulted directly from DeMuth's discriminatory act, constitutes state action for constitutional purposes. Therefore, Miller's claim that his rights under the Equal Protection Clause have been violated must be addressed.

In analyzing this claim, it is necessary, initially, to determine the appropriate level of scrutiny to be applied to the challenged classification. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Generally, a challenged classification is presumed to be valid and need only be rationally related to a legitimate end. *Id.* However, that presumption gives way when a classification is considered suspect or quasi-suspect because it is based on factors, such as race or sex, that are seldom relevant to the achievement of any legitimate state interest. *Id.* Miller argues that homosexuals form a quasi-suspect class and, therefore, that the challenged classification must be subjected to heightened scrutiny. If so, the classification must be substantially related to an important governmental interest. *Id.*

The United States Supreme Court has never determined whether a classification based on sexual orientation is quasi-suspect. Recently, however, a federal district court, faced with such a claim, determined that classifications based on sexual orientation are, indeed, quasi-suspect. *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati,* 860 F.Supp. 417 (S.D.Ohio 1994) (enjoining voter-initiated amendment to city charter that would bar city from prohibiting discrimination based on sexual orientation); *see also Rowland v. Mad River Local Sch. Dist.,* 470 U.S. 1009, 105 S.Ct. 1373, 84 L.Ed.2d 392 (1985) (Brennan, J., joined by Marshall, J., dissenting from denial of *certiorari* ) (employment classification based on homosexuality deserving of at least heightened scrutiny); Laurence H. Tribe, American Constitutional Law 1616 (2d ed. 1988) ("homosexuals in particular seem to satisfy

all of the Court's implicit criteria of suspectness"). Nevertheless, while Miller's argument is not without force, I find it unnecessary to decide whether a classification based on sexual orientation is quasi-suspect because, for the reasons set forth below, I conclude that the challenged classification fails to satisfy even the less stringent, rational-basis standard.

Generally, a non-suspect classification will not "run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257, 270 (1993). However, while the classification is presumptively valid, *id.*, "even the standard of rationality ... must find some footing in the realities of the subject addressed...." *Id.* at ——, 113 S.Ct. at 2643, 125 L.Ed.2d at 271. It is well-established that "irrational prejudice," "mere negative attitudes, or [unsubstantiated] fear ... are not permissible bases for [differential] treatment." *Cleburne, supra,* at 448–50, 105 S.Ct. at 3259–60, 87 L.Ed.2d at 325–27 (finding classification based on mental retardation irrational); *see also Able v. United States,* 863 F.Supp. 112 (E.D.N.Y.1994) (military policy of discharging homosexuals, if based on prejudice, is irrational). Therefore, if the classification based on sexual orientation in the present case is founded on prejudice or unsubstantiated fear, it cannot be enforced without violating the Equal Protection Clause of the Fourteenth Amendment. *See also United States Dep't of Agric. v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782, 788 (1973) (finding discrimination aimed at hippies irrational and concluding that, if "the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest").

Recently, the Ninth Circuit Court of Appeals, in *Meinhold v. United States Dep't of Defense,* 34 F.3d 1469 (9th Cir.1994), considered a similar claim when faced with an equal protection challenge by Keith Meinhold to his Naval discharge because of his status as a homosexual. Meinhold, who had served suc-

cessfully as an enlisted member of the United States Navy for 12 years, was discharged, like Miller, after a television acknowledgment that he was gay. Meinhold was not accused of engaging in any homosexual conduct that interfered with his service. Although recognizing that military decisions are entitled to great deference, the court nevertheless concluded that the policy of discharge, to the extent that it rested solely on the *status* of homosexuality, was without rational basis. Accordingly, it affirmed summary judgment for Meinhold. *See also Dahl v. Secretary of the United States Navy*, 830 F.Supp. 1319, 1337 (E.D.Cal.1993) (construing *Cleburne* and *Heller* to find Navy's discharge of Dahl for homosexual status was based on illegitimate prejudice and was, therefore, irrational as a matter of law); *Cammermeyer v. Aspin*, 850 F.Supp. 910, 929 (W.D.Wash.1994) (Army nurse discharged for homosexual status entitled to judgment as a matter of law on equal protection claim because a policy, whether "founded on unsubstantiated fears, cultural myths, stereotypes or erroneous assumptions, cannot be the basis for a discriminatory classification").

The present case does not implicate a similar policy of special deference. Here, DeMuth conceded at trial that he terminated Miller's employment because of his homosexuality. N.T., *supra*, at 33–34, 36, 58, 60–61, 63, 66–67. As in *Meinhold, Dahl* and *Cammermeyer*, there were no allegations that Miller engaged in homosexual conduct in the course of his employment. Miller's discharge, like those described above, was based on Miller's acknowledged status as a homosexual. This reveals precisely the kind of action based on prejudice that was rejected as irrational in the above-cited cases. *See also Cleburne, supra*, 473 U.S. 432, 105 S.Ct. 3249; *Moreno, supra*, 413 U.S. 528, 93 S.Ct. 2821.

Moreover, in *Equality Foundation of Greater Cincinnati, Inc., supra*, 860 F.Supp. 417, a federal district court in Ohio enjoined a voter-initiated amendment to the Cincinnati Charter, which would have barred the city from enacting legislation protecting homosexuals from discrimination based on sexual orientation. The court, considering an equal protection challenge, found that

> sexual orientation, whether hetero- homo-, or bisexual, bears no relation whatsoever to an individual's ability to perform, or to participate in, or contribute to, society. Indeed the American Psychological Association has so concluded.... If homosexuals were afflicted with some sort of impediment to their ability to perform and to contribute to society, the entire phenomenon of "staying in the Closet" and of "coming out" would not exist; their impediment would betray their status.

*Id.* at 437 (citation omitted). Although that court concluded that homosexuals constitute a quasi-suspect class, it nevertheless found that the challenged classification could not survive rational-basis scrutiny.

In the present case, DeMuth acknowledged that Miller was capably performing his job prior to discharge. N.T., *supra,* at 46–49, 64. In fact, DeMuth admitted that Miller was on the partnership track. *Id.* at 57. Miller's homosexuality did not affect his ability to work for DeMuth, and the decision to terminate him is not justified by nondiscriminatory reasons that are unrelated to Miller's homosexuality. Thus, court enforcement of DeMuth's actions, "far from demonstrating governmental neutrality on the issue of homosexuality, [would give] effect to private prejudice." *Equality Foundation,* 860 F.Supp. at 444, citing *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). *See also Dahl, supra* 830 F.Supp. 1319 (concluding that both plaintiff's and defendant's evidence showed discharge decision not based on inability to perform work and finding military policy irrational).

DeMuth also claimed that he feared others' prejudice toward Miller and that this concern provided a legitimate basis for his actions. N.T., *supra,* at 60. However, fear of prejudice cannot justify court advancement of DeMuth's actions. A similar justification for court involvement was rejected in *Palmore, supra.* There, the Court overturned the denial of child custody to a natural mother based on the mother's biracial remarriage. The Court rejected the argument that the award of custody was improper in light of the societal pressures the child would face. Relying upon *Shelley, supra*

334 U.S. 1, 68 S.Ct. 836 the Court first concluded that judicial action in awarding custody was a form of state action. It then determined that society's negative reaction to the child's being raised within a biracial marriage did not legitimate the custody denial. The Court concluded that, while "[t]he Constitution cannot control such prejudices[,] . . . neither can it tolerate them." *Palmore, supra,* at 433, 104 S.Ct. at 1882, 80 L.Ed.2d at 426. *See also Dahl, supra* (interpreting *Palmore* and rejecting argument that heterosexual dislike and fear of homosexuals was a rational basis for the military's exclusionary policy); *Blew v. Verta,* 420 Pa.Super. 528, 617 A.2d 31 (1992) (concern over negative societal reactions could not justify a court's custody restrictions placed on lesbian parent).

Similarly, while DeMuth's "[p]rivate biases may be outside the reach of the law, . . . the law cannot, directly or indirectly, give them effect." *Palmore, supra,* at 433, 104 S.Ct. at 1882, 80 L.Ed.2d at 426; *accord Cleburne, supra,* at 448, 105 S.Ct. at 3259, 87 L.Ed.2d at 326; *Equality Foundation, supra,* at 441. Notably, the impetus for this case was Miller's success in acquiring the business of DeMuth's former clients. Thus, not only does DeMuth's concern about client prejudice fail to justify his actions, but also reality has borne out the false nature of his concerns.

In responding to Miller's equal protection claim, DeMuth relies on several cases in which differential treatment of homosexuals was found to be rational. *See* Brief for Appellee at 25–35, citing, among other cases, *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563 (9th Cir. 1990) (Department of Defense denial of security clearances); *Ben–Shalom v. Marsh,* 881 F.2d 454 (7th Cir.1989) (Army discharge), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Woodward, supra* (Naval discharge); *Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987) (FBI discharge). However, those cases do not militate in favor of a finding that the challenged action in the present case was rationally related to a legitimate end. In the first place, each case relied on the policy of judicial deference afforded governmental decisions implicating national security concerns, none

of which are present here. *High Tech Gays,* 895 F.2d at 577; *Ben–Shalom,* 881 F.2d at 463–65; *Woodward,* 871 F.2d at 1077; *Padula,* 822 F.2d at 104. Moreover, the courts in *Ben–Shalom,* 881 F.2d at 464, *Woodward,* 871 F.2d at 1074 n. 6, and *Padula,* 822 F.2d at 102, determined that the issue presented involved prohibited homosexual *conduct* rather than *status-based* discrimination. Similarly, in *Pruitt v. Cheney,* 963 F.2d 1160 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992), the Ninth Circuit Court of Appeals reviewed its decision in *High Tech Gays* and determined that it, too, "was a case relating to conduct, not orientation." *Id.* at 1166 n. 5. The court proceeded to find that Pruitt, a chaplain discharged from the Army Reserve after acknowledging her homosexuality in an interview with the *Los Angeles Times,* had stated an equal protection claim.

Moreover, contrary to DeMuth's assertions, *see* Brief of Appellee at 25–35, the decision in *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), does not require a different result. In *Hardwick,* the Court upheld the constitutionality of a Georgia sodomy statute against Hardwick's claim that it violated his fundamental right to privacy. However, the Court specifically noted that Hardwick did "not defend the judgment below based on . . . the Equal Protection Clause." *Id.* at 196 n. 8, 106 S.Ct. at 2847 n. 8, 92 L.Ed.2d at 149 n. 8. Therefore, it is inapposite. *See Schowengerdt v. United States,* 944 F.2d 483, 490 n. 8 (9th Cir.1991) (distinguishing equal protection from substantive due process challenge to military policy), *cert. denied,* 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992); *Evans v. Romer,* 882 P.2d 1335, 1349–50, *40–41 (Oct. 11, 1994) (holding state initiative barring protection against discrimination aimed at homosexuals unconstitutional and concluding that *Hardwick* decision on right to privacy does not abate other rights of homosexuals); Prof. Cass Sunstein, *Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection,* 55 U.Chi.L.Rev. 1161 (1988). Further, nothing in *Hardwick,* which held that a state could constitutionally criminalize homosexual sodomy, suggests that a state may discrimi-

nate against or penalize an individual because of the status of sexual orientation alone. *Cf. Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (state may not criminalize status of drug addiction absent prohibited acts); *see also Meinhold, supra,* 34 F.3d at 1476–79 (distinguishing homosexual conduct from status of sexual orientation); *Equality Foundation, supra,* 860 F.Supp. at 424, 426, 437–40 (same, and distinguishing *Hardwick* ); *Cammermeyer, supra,* 850 F.Supp. at 918–20 (same).

In sum, because DeMuth's termination of Miller was admittedly based on prejudice, I find that, pursuant to the reasoning of *Cleburne, Equality Foundation, Meinhold* and the other cases discussed above, DeMuth's action was without a rational basis. Accordingly, the trial court, through its powers as an agent of the state, could not enforce the related liquidated damages provision without advancing an impermissible, discriminatory end and thereby offending the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

At this point, I note my disagreement with Judge Popovich's characterization of the third issue in this case. My colleague maintains that the termination of Miller was not related only to Miller's homosexuality, but also to his public communication of his views on television. *See* Opinion by Popovich, J., at 18–21. He then analyzes Miller's claim based upon that characterization and resolves the issue against Miller. *Id.* However, DeMuth conceded at trial that the termination related directly to Miller's homosexuality. N.T., *supra,* at 33–34, 36, 58, 60–61, 63, 66–67. Thus, the issue that Judge Popovich addresses, which is more properly framed as whether the court could enforce the disputed contract provision for a termination related to public, political speech regarding anti-homosexual violence, is not before us. *But compare Van Ooteghen v. Gray,* 654 F.2d 304 (5th Cir.1981) (dismissal of assistant county treasurer because of his announced intention to publicly address civil rights of homosexuals violated First Amendment), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982); *Ancafora v. Board of Educ.,* 491 F.2d 498

(4th Cir.) (school teacher's addressing homosexuality during TV appearance could not justify dismissal because speech was constitutionally protected), *cert. denied,* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974). Moreover, as discussed above, DeMuth's concern over others' reactions to the television appearance cannot legitimate Miller's termination. *See Palmore, supra* 466 U.S. 429, 104 S.Ct. 1879.

Lastly, I find that the trial court erred in rejecting Miller's equal protection claim based, in part, on its inability to discern "any current legislative or societal consensus" that disdain for homosexuals is a type of bigotry. Trial Court Opinion, dated December 20, 1993, at 6. The trial court offers no authority that requires such a determination as a prerequisite to an equal protection analysis. . Indeed, this type of an inquiry would be antithetical to the very purpose of the constitutional guarantee of equal protection of the laws to all individuals. Hence, the trial court erred in preceding its constitutional analysis with a determination of public policy. Further, the trial court's analysis overlooks significant sources of legislative and societal consensus. Such "sources of public policy [which may limit an employer's right of discharge] include legislation [and] administrative rules, regulation, or decision...." *Cisco v. United Parcel Servs., Inc.,* 328 Pa.Super. 300, 306, 476 A.2d 1340, 1343 (1984), quoting *Pierce v. Ortho Pharmaceuticals Corp.,* 84 N.J. 58, 417 A.2d 505, 512 (N.J.1980). Pursuant to executive order, Pennsylvania bans employment discrimination based on sexual orientation in any agency under the jurisdiction of the governor. Pa.Exec.Order No. 1988–1 (1/20/88), *reprinted in* 4 Pa.Code § 1.4 (1988). In addition, many cities across the state have outlawed employment discrimination based on sexual orientation. *See* Pittsburgh, Pa., Code, title VI, art. 5, ch. 651 *et seq.* (1990); Philadelphia, Pa., Code, ch. 9–1100, § 9–1103 (1982); Harrisburg, Pa., Codified Ordinances, art. 725, § 725.06 (1983); Lancaster, Pa., Ordinance 11 (1991); York, Pa., Codified Ordinances, art. 185, § 185.02 (1992). Moreover, even if it were true that state law would not prevent DeMuth's private discrimination based on sexual orientation, the United States Supreme Court, in *Shelley,* made

clear that, when courts enforce private action, such "judicial action is not immunized from the operation of the Fourteenth Amendment simply because it is taken pursuant to the state's common-law policy." *Shelley, supra,* at 31, 68 S.Ct. at 845, 92 L.Ed. at 1184.

Based on the foregoing analysis, I would find that the trial court erred in denying Miller's motion for judgment notwithstanding the verdict and in entering judgment in favor of DeMuth. Therefore, I would reverse the entry of judgment and direct entry of judgment notwithstanding the verdict in favor of Miller.